IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TASHAWNA GAINES,

    *Plaintiff*,

v.

    Civil Action No. ELH-21-1211

BALTIMORE POLICE
DEPARTMENT,

    *Defendant*.

**MEMORANDUM OPINION**

In this employment discrimination case, plaintiff Tashawna Gaines, a former employee of

the Baltimore Police Department (the "BPD"), has sued the BPD, alleging discrimination in

violation of three statutes:  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e *et seq*. ("Title VII"); 42 U.S.C. § 1981; and the Maryland Fair Employment Practices Act

("FEPA"), Md. Code (2021 Repl. Vol.), § 20-601 *et seq.* of the State Government Article ("S.G.").

ECF 1 (the "Complaint").[1]  The Complaint contains six counts, asserting the following claims:

discrimination on the basis of race, in violation of Title VII (Count I); discrimination on the basis

of sex, in violation of Title VII (Count II); hostile work environment on the basis of race and sex,

in violation of Title VII (Count III); retaliation, in violation of Title VII (Count IV); discrimination

on the basis of race, in violation of 42 U.S.C. § 1981 (Count V); and discrimination on the basis

of race and sex, in violation of FEPA (Count VI).  *Id*.

---

[1] The caption of the Complaint refers to the defendant as "Baltimore City, Maryland; Baltimore Police Department."  ECF 1 at 1.  This could imply that plaintiff has sued both the BPD and Baltimore City. However, the text of the Complaint refers to the "defendant" in the singular, and elsewhere it makes clear that the BPD is intended as the sole defendant. *Id*. ¶¶ 15-18.

Defendant has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment prior to discovery.  ECF 10.  The motion is supported by a memorandum (ECF 10-1) (collectively, the "Motion") and several exhibits.  ECF 10-3 to ECF 10-6.  Plaintiff opposes the Motion (ECF 11), supported by a memorandum (ECF 11-1) (collectively, the "Opposition") and one exhibit.  ECF 11-3.  Defendant has replied.  ECF 12 (the "Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall construe the Motion as a motion to dismiss.   And, I shall grant the Motion, with leave to amend.

## I. Factual Background[2]

Plaintiff, an "African American female," ECF 1, ¶ 14, was an employee of the BPD for sixteen years.  *Id.* ¶¶ 17-19.   She left the BPD in 2015, with the rank of sergeant, but returned to the BPD on March 13, 2017.  *Id.* ¶ 19.  However, Gaines was not rehired as a sergeant.  *Id.* ¶ 20.[3]

Plaintiff alleges that when she returned to the BPD in 2017, Police Commissioner Kevin Davis told her that "her supervisor status as sergeant would not be an option." *Id.*[4]  But, she asserts that other, similarly situated male employees returning to the BPD were "granted their rank back as sergeant upon returning to work at BPD under the same or similar circumstances . . . ."  ECF 1,

---

[2] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. But, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

[3] The Complaint sometimes refers to plaintiff as "Sgt. Gaines." *See, e.g.*, ECF 1, ¶¶ 19, 21, 23-24. But, the narrative makes clear that plaintiff was not rehired as a sergeant. *See id.* ¶ 20. Furthermore, on plaintiff's Request for Secondary Employment form, dated September 18, 2018, she gave her title as "Ofc.," not "Sgt." *See* ECF 10-4.

[4] Davis is no longer the BPD Commissioner.

¶ 20.  According to plaintiff, on April 26, 2019, the Equal Employment Opportunity Commission ("EEOC") found that plaintiff established reasonable cause to believe that BPD violated Title VII when it "denied her rehire at her prior rank."  *Id*. ¶ 7; *see id.* ¶ 20.[5]

On September 18, 2017, approximately six months after rejoining the BPD, plaintiff sought "secondary employment outside of the BPD at WBAL News Radio as a news anchor/reporter, scheduled for Saturdays and Sundays from 6 a.m. to 2 p.m."  *Id*. ¶ 21.  Accordingly, she submitted a secondary employment request to defendant, which was approved by Lieutenant Donald Gerkin, plaintiff's Shift Commander, and Major Rich Gibson, the District Commander and Davis's "designee for the Northern District."  *Id*. ¶ 22.  These individuals "possessed the authority to grant approval of the secondary employment."  *Id*.

"Subsequently however, Commissioner Davis denied the secondary employment approval claiming that the approval was null and void without his signature."  *Id*.  The BPD claimed that plaintiff had submitted the wrong form, and that the correct form would have required Davis's approval.  *Id*. ¶ 23.  However, the Complaint contends that at the time plaintiff submitted her request in September 2017, the form she completed was the only one that was available, and that the form the BPD labels as the correct one was not created until March 2018.  *Id*.  In addition, when plaintiff filled out her request form in September 2017, she "was not informed that there were issues with the form she submitted prior to the initial approval signed by *two* of her superiors."  *Id*. (emphasis in original).  Further, she was not informed "that the secondary

---

[5] The claims of discrimination in the actual counts of the Complaint do not appear to relate to plaintiff's rehiring.  Instead, they relate to what happened regarding plaintiff's request for secondary employment.  *See* ECF 1, ¶¶ 21-31, 36, 58, 78, 125.

employment she sought did not meet the requirements under the provisions of the BPD." ECF 1, ¶ 24.

According to the Complaint, "instead of allowing Plaintiff to rectify any administrative issues, Commissioner Davis requested that Plaintiff either terminate her secondary employment or resign from the BPD or be charged with insubordination and failure to obey command." *Id.* ¶ 25. In addition, Davis "advised" Gibson, Gerkin, and a third BPD officer, Sergeant Tanesha Todd, to inform plaintiff that she "was not allowed to work at her secondary employment or be subjected to the above-mentioned disciplinary issues." *Id.* ¶ 26.

In the Motion, defendant cites to paragraph 25 of the Complaint to assert that plaintiff began her requested secondary employment on September 28, 2017. *See* ECF 10-1 at 3. The Motion also cites to the Charge that plaintiff submitted to the EEOC on November 6, 2017, in which she stated that she began her secondary employment on September 28, 2017. *See* ECF 10-3 (the "Charge") at 1. But, the Complaint does not explicitly allege that plaintiff ever began her secondary employment. At best, it is implied by the assertion that Davis "requested that Plaintiff . . . terminate her secondary employment . . . ." ECF 1, ¶ 25.

In any event, plaintiff alleges that "similarly situated male Caucasian employees" who submitted a secondary employment request were able to gain approval from their shift commanders, instead of having to obtain approval from Davis. *Id.* ¶ 27. In particular, the Complaint mentions "Police Officer Sergeant Zimmerman (Caucasian male)," who sought and obtained approval for secondary employment from his shift commander, without needing to

receive approval from Davis.  ECF 1, ¶ 29.[6]  The Complaint provides no other information as to Zimmerman or his circumstances.

Plaintiff requested an explanation as to why "similarly situated Caucasian male workers" obtained secondary employment after receiving approval from their shift commanders, whereas she was required either to terminate her secondary employment, resign from the BPD, or be charged with insubordination and failure to obey command. *Id*. ¶ 28.  She pointed to Zimmerman as an example. *Id*. ¶ 29.

After plaintiff raised this issue, the BPD "rescinded their [sic] disapproval and approved the secondary employment request again." *Id*. ¶ 30.  When the BPD approved the request, it "did not produce any evidence that Plaintiff was asked to complete the 'correct' form as earlier indicated by BPD." *Id*.  According to the Complaint, although defendant ultimately approved plaintiff's secondary employment request, it "essentially rejected the modification [sic] work schedule, which forced Plaintiff to resign from her position." *Id*.  No further information about the alleged rejection or a modified work schedule is included in the Complaint.

The defense included with the Motion a "Request for Secondary Employment" form submitted by plaintiff. *See* ECF 10-4.  As discussed, *infra*, I may consider the exhibit.   On the form, plaintiff indicated that she was seeking a position as "Radio News Anchor/Reporter." *Id*. She included information as to her requested secondary employment, consistent with what is recounted above, and signed the form on September 18, 2017. *Id*.  She also provided her "Reason for Desiring Secondary Employment," stating: "Career enhancement and career development in radio communications." *Id*.  Below plaintiff's signature is a "Reviewed By" box, with space for a

---

[6] According to the Complaint, upon information and belief, Zimmerman has passed away. ECF 1 at 6 n.1.

signature and "Recommendation" from each reviewer.  ECF 10-4.  The "Reviewed By" box contains two signatures.  *Id.*  One appears to be by a sergeant, and one appears to be by a lieutenant, but the handwriting is not clear enough to identify the name of either individual.  *Id.*  Next to each signature, in boxes located under the word "Recommendation," each reviewer wrote "Approved." *Id.*  One signature is dated September 18, 2017, and the other is dated September 19, 2017.  *Id.*

Under the "Reviewed By" box is another box, labelled "Comments About Recommendation."  *Id.*  The word "Approved" is written in this box.  *Id.*  Below this box is a section that contains space for the name and signature of the "Commanding Officer," as well as a date.  *Id.*  A name and signature appear in this space, with a date of September 18, 2017.  *Id.* However, the handwriting is not clear enough to determine the name of this individual.  Below this area is a space marked "Action of the Overtime Unit Commanding Officer," with a space for a signature and the date.  *Id.*  The word "Approved" appears above "Action of the Overtime Unit Commanding Officer," with another unclear signature, and a date of October 2, 2017.  *Id.*[7]

Further, the Complaint alleges: "On October 28, 2017, in order to avoid insubordinations [sic] or failure to obey order, Plaintiff was forced to retire from BPD."  ECF 1, ¶ 31.  On the day plaintiff resigned, she was not given a "reasonable explanation" as to why she was "forced to resign, while a similarly situated Caucasian male (Sergeant Zimmerman) was not [forced to resign]."  *Id.*

On November 6, 2017, following plaintiff's resignation, she filed a Charge with the EEOC. *Id.*  ¶ 7; *see* ECF 10-3.  The Charge recounted the circumstances of plaintiff's secondary employment request and resignation, as alleged above, and asserted discrimination on the basis of race and sex, as well as retaliation.  ECF 10-3 at 1-2.  In the Charge, plaintiff stated that the

---

[7] The signature is followed either by initials or the abbreviation "Sgt". ECF 10-4.

discrimination occurred between September 28, 2017, and October 26, 2017.  But, she did not check the box marked "Continuing Action."  ECF 10-3 at 1.

Plaintiff filed an amended charge with the EEOC on May 25, 2018, in which she added that she had "since learned" of male individuals who had received their rank of sergeant after having rejoined the BPD, an option that was allegedly denied to plaintiff.  ECF 10-6 (the "Amended Charge") at 1-2.  The Amended Charge retained the same bases for discrimination, as well as the same dates, *i.e.*, September 28, 2017, to October 26, 2017.  *Id*. at 1.

The EEOC issued a "Determination" as to plaintiff's Amended Charge on April 26, 2019.  ECF 11-3 at 2-3 (the "Determination").  The Determination noted that the BPD had not responded to the EEOC's request for a response regarding plaintiff's rehiring allegations.  *Id*. at 2.  Because of this failure to respond, the EEOC "inferred that examination of [the BPD's] evidence would not refute [Gaines's] allegation."  *Id*.  Accordingly, the EEOC found that "the evidence provided by [Gaines] establishes reasonable cause to believe that [the BPD] violated Title VII when it denied her rehire at her prior rank."  *Id*.  However, with regard to plaintiff's other allegations, the EEOC "made no finding."  *Id*.

The Determination explained that the EEOC would attempt to eliminate the alleged practice by conciliation.  *Id*. at 2-3.  However, in a letter to plaintiff dated June 25, 2019, the Director of the Baltimore Field Office of the EEOC informed plaintiff that the EEOC's efforts to conciliate her Charge "have been unsuccessful."  *Id*. at 1; *see also* ECF 1, ¶ 8.  The letter also informed plaintiff that the "case has been referred" to the Justice Department to determine if a civil action should be brought.  ECF 11-3 at 1; ECF 1, ¶ 8.

Approximately two years later, plaintiff, through counsel, requested a right-to-sue letter.  ECF 1, ¶ 8.  The right-to-sue letter was issued on April 16, 2021.  *Id*. ¶ 9.  This litigation followed.

Plaintiff alleges that she was discriminated against on the basis of her race and sex, in violation of Title VII, when "she was forced to resign, while similarly situated Caucasian male employees such as Officer Zimmerman were allowed to obtain secondary employment approval through their Shift Commander, and not forced to resign like Plaintiff."  ECF 1, ¶¶ 36, 58.  She also asserts that she was "subjected to verbal harassment" when Davis informed her "that she must either terminate her secondary employment, resign from BPD, or be charged with insubordination and failure to obey command, based on her statutorily protected class as an African American woman."  *Id*. ¶ 78.

Gaines also asserts that she was subjected to retaliation after she reported the discrimination to the EEOC.  *Id*. ¶ 88.  She alleges that she "complained to the EEOC that Commissioner Kevin Davis, told Plaintiff that upon her return, her supervisor status as sergeant would not be an option." *Id*.  And, according to the Complaint, "[a]fter Plaintiff's statutorily protected activity, she was subjected to retaliation, including but not limited to, where Plaintiff was forced to resign. . . ." *Id*.

In addition, plaintiff alleges that, because of her race, "she was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint," in violation of 42 U.S.C. § 1981. *Id*. ¶ 112.  As for FEPA, Gaines contends that she was "subjected to harassment or offensive conduct that is based on race and sex, where Plaintiff was forced to resign."  *Id*. ¶ 125.

Plaintiff also attempts to connect her allegations as to discrimination on the basis of race and sex to larger institutional problems at the BPD.  She asserts that "the complicit institutional engine that acquiesces in the destruction and demise of BPD's own Black women officers and sergeants remains pervasive, continuous, and swept under the rug." *Id*. ¶ 1.

Additional facts are included in the Discussion, *infra*.

## II.  Standards of Review

### A. Summary Judgment

As noted, the Motion is styled as a "Motion to Dismiss Plaintiff's Complaint, Or In the Alternative For Summary Judgment." ECF 10.  A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[8]

_____

[8] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5C Wright & Miller, Federal Practice & Procedure § 1366 (3d ed. 2018). But, this discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id*.

However, summary judgment is usually inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. de Pont de Nemours and Co. v. Kolon Indus., Inc*., 637 F.3d 435, 448-49 (4th Cir. 2011).  But, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"[T]o justify a denial of summary judgment on the grounds that . . . discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub nom. Gardner v. Ally Financial*, 514 Fed. App'x 378 (4th Cir. 2013)

(per curiam). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

The case of *McCray v. Md. Dep't of Trans.*, 741 F.3d 480 (4th Cir. 2014), is informative. There, the plaintiff had been an employee of the defendant for many years, and filed an EEOC Charge alleging, *inter alia*, discrimination under Title VII, based on race and gender. *Id*. at 481-82. In the district court, the plaintiff opposed the defendant's motion to dismiss and sought an opportunity to conduct discovery. *Id*. at 482. The district court denied plaintiff's motion, however, reasoning that the parties had engaged in considerable discovery during the EEOC investigation and had submitted substantial documentary evidence in support of their positions. *Id*. Therefore, the court converted the defendant's motion to one for summary judgment. The Fourth Circuit concluded that the district court erred when it granted summary judgment to the defense without providing plaintiff an opportunity to conduct discovery. *Id*. at 481, 483-84.

Notwithstanding the significant administrative record in that case, the Fourth Circuit made clear that discovery is appropriate when "the main issue" is "one of motive" and when "most of the key evidence lies in the control" of the party moving for summary judgment. *Id*. at 484. The plaintiff's Title VII claims required her to show "that she was fired because of discriminatory reasons," and such evidence was within the control of the defendant. *Id*. "Absent discovery," said the Court, the plaintiff lacked "adequate access to this evidence, and therefore no way to shield

11

herself from a premature summary judgment motion." In its view, this was akin to "forc[ing] the non-moving party into a fencing match without a sword or mask." *Id*. at 483-84.

In this case, there has been no discovery. Defendant asserts that summary judgment is appropriate because each count in the Complaint "is based upon allegations that Defendant can conclusively refute;" plaintiff is on notice of matters outside of the Complaint that are present in the Motion; and no additional discovery is necessary. ECF 10-1 at 6. In response, plaintiff has not filed a Rule 56 affidavit. However, plaintiff generally asserts that the Motion "demonstrates disputed facts and potential defenses which need to proceed through discovery, and ultimately should only be heard and considered by a jury." ECF 11 at 1.

In my view, summary judgment is inappropriate. As discussed, *infra*, three of the four documents submitted with the Motion may be considered at the motion to dismiss stage (*see* ECF 10-3; ECF 10-4; ECF 10-6), as can the document provided by plaintiff with the Opposition. *See* ECF 11-3. And, the document that cannot be considered at the motion to dismiss stage—defendant's position statement submitted for the EEOC proceedings—is referenced only once in the Motion, and is not relied upon by defendant for any of the substantive arguments in the Motion. *See* ECF 10-5; *see also* ECF 10-1 at 3. Most of the extrinsic material provided to the Court can be considered by the Court without construing the Motion as one for summary judgment.

Furthermore, the arguments advanced in the Motion are precisely the sort of arguments that would be made at the motion to dismiss stage. They regard the facts alleged in the Complaint as true, but contend that they do not state a claim, or otherwise suffer from other legal deficiencies. And, perhaps most significant, plaintiff has not had an opportunity to conduct discovery.

Accordingly, I will construe the Motion as a motion to dismiss under Fed. R. Civ. P. 12.

## B. Rule 12(b)(1)

The Motion does not invoke Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits a defendant to challenge the court's subject matter jurisdiction.  However, the Motion contends that Count VI of the Complaint must be dismissed because defendant enjoys sovereign immunity in federal court as to the FEPA claim.  *See* ECF 10-1 at 17-18.  Generally, such an argument is addressed under Rule 12(b)(1), rather than Rule 12(b)(6).  This is because "[s]overeign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (internal citation omitted), *cert. denied*, 139 U.S. 417 (2018); *see also, e.g.*, *Phillips v. Md. Bd. of Law Examiners*, ADC-19-2427, 2021 WL 633378, at *4 (D. Md. Feb. 18, 2021); *Davis v. Pavlik*, GLH-20-547, 2020 WL 7489011, at *2 (D. Md. Dec. 21, 2020).

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction.  *See Demetres v. E. W. Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty.*, 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).  However, a court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'"  *B.F. Perkins*, 166 F.3d at 647 (citation omitted).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge.  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *accord Hutton v. Nat'l Bd. of Exam'rs Inc*., 892 F.3d 613, 620-21 (4th Cir. 2018). Here, defendant raises a facial challenge to the Court's subject matter jurisdiction as to Count VI,

asserting that the doctrine of sovereign immunity forecloses plaintiff's claim.   In such a case, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated."  *Hutton*, 892 F.3d at 621 n.7; *see Kerns*, 585 F.3d at 192 (noting that in a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction").

### C. Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556

U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304-05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v.*

*Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

In resolving a Rule 12(b)(6) motion, the question for the court is whether the plaintiff has stated a plausible claim for relief. *Twombly*, 550 U.S. at 570. At the motion to dismiss stage, however, a plaintiff need not establish a prima facie case of discrimination.

In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the "prima facie case under *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)] . . . is an evidentiary standard, not a pleading requirement." Further, the Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Swierkiewicz*, 534 U.S. at 511. Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, 557 U.S. 1138 (2016).

However, as the Second Circuit has observed, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544. *See Littlejohn v. Cty. of New York*, 795 F.3d 297, 307 (2d Cir. 2015).

16

On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent." *Id.* at 309.  On the other hand, in *Twombly* the Court said that a plaintiff must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of Twombly is applicable in "'all civil actions' . . . ." *Iqbal*, 556 U.S. at 684.

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies[.]" *See Swaso v. Onslow Cty. Bd. of Educ.*, 698 Fed. App'x 745, 747-48 (4th Cir. 2017) ("While a plaintiff need not plead a prima facie case to survive a motion to dismiss, a Title VII complaint is still subject to dismissal if it does not meet the ordinary pleadings standard under *Twombly* and *Iqbal*." (internal citations omitted)); *see also Holloway v. Maryland*, ___ F.4th ___, 2022 WL 1207165, at *3 (4th Cir. Apr. 25, 2022); *McCleary*, 780 F.3d at 584; *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012).

In sum, at the motion to dismiss stage the question "is whether [the plaintiff] alleges facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020) (quoting *Coleman*, 626 F.3d at 190).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir.

2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009).   Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'"   *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"   *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).   *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).   In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]"   *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

And, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it."   *Goines*,

822 F.3d at 167.  Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper."  *Id.*  Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true."  *Id.*

Moreover, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment.  *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).  In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."  *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'"  *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'"  *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,

322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

"In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions." *Campbell v. Mayorkas*, 3:20-cv-697-MOC, 2021 WL 2210895, at *1 n.3 (W.D.N.C. July 1, 2021) (citing *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018)). Under the principle, I may consider the following documents attached to the Motion, because they are referenced in or otherwise integral to the Complaint, their authenticity is not disputed, and plaintiff does not take issue with their consideration: plaintiff's Charge (ECF 10-3); plaintiff's approved secondary employment request form (ECF 10-4); and plaintiff's Amended Charge (ECF 10-6). Likewise, I may consider the EEOC's Determination, submitted with the Opposition. ECF 11-3. However, I may not consider ECF 10-5, which is defendant's position statement regarding plaintiff's charge, submitted to the EEOC on November 19, 2018, including various supporting documents. This document is neither referenced in nor integral to the Complaint.

A plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of her opposition briefing. *See, e.g.*, *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."); *Glenn v. Wells Fargo Bank, N.A.*, DKC-3058, 2016 WL 3570274 at *3 (D. Md. July 1, 2016) (declining to consider declaration

attached to brief opposing motion to dismiss because, among other things, it included allegations not alleged in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993).

### III.  Discussion

### A. Count I and Count II (Race and Sex Discrimination)

In Count I and Count II, plaintiff lodges claims of race and sex discrimination, respectively, for allegedly being "forced to resign" because of the manner in which defendant handled her secondary employment request.  ECF 1, ¶¶ 36, 58.  Defendant argues that plaintiff has failed adequately to plead Title VII discrimination claims in these counts.  ECF 10-1 at 7-12.

### 1. Title VII Discrimination Principles

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2.  *See Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 117 (4th Cir. 2021).  This proscription is "often referred to as the 'disparate treatment' (or 'intentional discrimination') provision . . . ." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015).  The Supreme Court has referred to discrimination based on one of the five characteristics specified above as "status-based discrimination."  *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013).

Moreover, "terms, conditions or privileges of employment" is "an expansive concept." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).

Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding. 42 U.S.C. § 2000e-3. In 42 U.S.C. § 2000e-3, it states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *See, e.g.*, *Sempowich*, 19 F.4th at 654; *Roberts*, 998 F.3d at 122; *Kitlinski v. United States Dep't of Justice*, 994 F.3d 224, 232 (4th Cir. 2021); *Evans v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F.3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

To state a prima facie claim of discrimination under Title VII, the plaintiff generally must allege "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc.*, *Inc.*, 807 F.3d 619, 626 (4th Cir. 2015) (quoting *Coleman*, 626 F.3d at 190); *see Sempowich*, 19 F.4th at 649-50; *Matias v. Elon Univ.*, 780 Fed. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 Fed. App'x 198, 203 (4th Cir. 2018).

As to the satisfactory job performance factor, a plaintiff need not "show that he was a perfect or model employee. Rather, a plaintiff must only show that he was qualified for the job and that he was meeting his employer's legitimate expectations." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019); *see Sempowich*, 19 F.4th at 650.

"[T]he existence of some adverse employment action is required" for a plaintiff to prevail on a Title VII discrimination claim. *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004). An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see also Laird v. Fairfax Cty, Va.*, 978 F.3d 887, 893 (4th Cir. 2020) ("For a discrimination claim, the plaintiff must show that her employer took an action that adversely 'affect[ed] employment or alter[ed] the conditions of the workplace.'" (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) ("*Burlington Northern*"))). And, the adverse action must have "occurred under circumstances that raise a reasonable inference of unlawful discrimination . . . ." *Sempowich*, 19 F.4th at 650 (citing *Bing*, 959 F.3d at 616 n.8; *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007)); *see also Swaso*, 698 Fed. App'x at 747-48 (requiring that "the adverse employment action occurred 'under circumstances giving rise to an inference of unlawful discrimination.'") (quoting *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011)).

Notably, in *Swaso*, a racial discrimination case, the Court said, 698 Fed. App'x at 748: "A plaintiff is not required to identify a similarly situated white comparator to prove her discrimination claim, so long as she can establish an inference of unlawful discrimination through

other means." *See also Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th Cir. 2010) ("Plaintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim."); *Bryant v. Aiken Regional Medical Ctrs.*, 333 F.3d 536, 545 (4th Cir. 2003) (same); *Bowen v. Md. Dep't of Pub. Safety and Correctional Servs.*, RDB-17-1571, 2018 WL 1784463, at *10 (D. Md. Apr. 12, 2018).   On the other hand, the "fourth element is met if 'similarly-situated employees outside the protected class received more favorable treatment.'" *Swaso*, 698 Fed. App'x at 747 (quoting *White v. BFI Waste Services*, 375 F.3d 288, 295 (4th Cir. 2004)).   And, "[w]here a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination," the plaintiff must demonstrate that the comparator is similarly situated in all relevant respects.  *Swaso*, 698 Fed. App'x at 748; *see Irani v. Palmetto Health*, 767 Fed. App'x 399, 420 (4th Cir. 2019) (per curiam); *Haywood*, 387 Fed. App'x at 359; *Coleman*, 626 F.3d at 191; *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008).

### 2. Analysis

As to both Count I and Count II, defendant argues that plaintiff has failed to allege satisfactory job performance; failed to identify an adequate comparator; and has not suffered any adverse employment action.  ECF 10-1 at 9-12.

Regarding satisfactory job performance, to state a prima facie Title VII claim a plaintiff "must only show that [s]he was qualified for the job and that [s]he was meeting [her] employer's legitimate expectations."  *Haynes*, 922 F.3d at 225.  In the Complaint, plaintiff alleges that she "is a qualified police officer" with "sixteen years of experience on the force," who had "maintained the title of Sergeant."  ECF 1, ¶¶ 36, 58.  At the motion to dismiss stage, these allegations are adequate to avoid dismissal.

As to a comparator, "[i]f a plaintiff wishes to prove that a defendant's legitimate, non-discriminatory explanation is pretext by pointing to other employees who were treated differently, '[t]he similarity between comparators . . . must be clearly established in order to be meaningful.'" *Swaso*, 698 Fed. App'x at 748 (citation omitted).  This includes "that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Haywood*, 387 Fed. App'x at 359 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

"'Overall, the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination.'"  *Id.* (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)).  The Fourth Circuit has remarked that "'[t]he similarly situated analysis typically occurs in the context of establishing a *prima facie* case of discrimination, not at the 12(b)(6) stage.'"  *Holloway*, 2022 WL 1207165, at *3 (quoting *Woods*, 855 F.3d at 651) (alteration in *Holloway*).  However, at the motion to dismiss stage, plaintiff should still "identify the proposed comparator and 'establish a plausible basis for believing [the employee was] actually similarly situated.'"  *Asi v. Info. Mgmt. Group, Inc.*, GLR-18-3161, 2019 WL 4392537, at *6 (D. Md. Sept. 13, 2019) (internal citation omitted) (alteration in *Asi*).

The Complaint alleges a single comparator, "Police Officer Sergeant Zimmerman," a "Caucasian male" who "sought and was approved for secondary employment by his shift commander" without needing approval from Davis.  ECF 1, ¶ 29.  In contrast to plaintiff, Zimmerman was not "forced to resign."  *Id.* ¶ 31.  The Complaint asserts, in a conclusory fashion,

that Zimmerman was "similarly situated."  ECF 1, ¶ 29.  But, the Complaint is devoid of facts as to Zimmerman that would establish a plausible basis to find that Zimmerman was similarly situated to plaintiff.

For example, the Complaint lacks information as to Zimmerman's duties and role in the BPD; the details of his secondary employment; his supervisors; his schedule; and even his first name.  Moreover, the Complaint makes clear that, when plaintiff was rehired, it was *not* as a sergeant.  *Id*. ¶ 20.  Thus, plaintiff held a different rank.  *See, e.g.*, *Young v. Montgomery Cty.*, CBD-18-2054, 2020 WL 5513438, at *6 (D. Md. Sept. 14, 2020) (noting that another police officer was an "invalid comparator[]" to plaintiff because, among other reasons, he was a sergeant and plaintiff was a corporal).

In addition, plaintiff alleges that her secondary employment request was approved, but her subsequent work schedule request was rejected.  *See* ECF 1, ¶ 30.  But, there is no allegation that Zimmerman requested a modification to his work schedule, or that one was requested and then granted.  *See, e.g.*, *id*. ¶ 29.

Moreover, it is noteworthy that plaintiff was essentially seeking secondary employment in a new career path—that of a journalist.  *See id*. ¶ 21.  This seems quite different from typical secondary employment for a police officer, such as moonlighting as a security guard to supplement income.  And, given the volume of local news coverage devoted to crime and policing issues, there appears to be a significant risk that an individual working as both a police officer and as a reporter, potentially covering events involving the police, could face a conflict of interest.  However, the Complaint never alleges that Zimmerman, nor any other BPD employee, sought secondary employment comparable to what plaintiff requested, with similar concerns.

As to the adequacy of the comparator allegations, *Coleman*, 626 F.3d 187, is relevant.  The plaintiff in *Coleman* brought a Title VII suit against his former employer, which had terminated him.  *Id*. at 189.  The plaintiff's termination had been justified, in part, by allegations that the plaintiff had steered contracts to vendors with which he had an interest, a charge the plaintiff labelled as false.  *Id*.  The plaintiff alleged that he had actually been terminated because he was African American, and because he had requested sick leave.  *Id*.  The plaintiff identified a named, white employee as similarly situated, because he also had "outside business involvements" but was not disciplined.  *Id*. at 190-91.  The district court dismissed the Title VII claim for failure to state a claim, and the Fourth Circuit affirmed.  *Id*. at 190.  The Fourth Circuit concluded that the comparator allegations were conclusory, and did not "establish a plausible basis for believing [the white employee] and Coleman were actually similarly situated or that race was the true basis for Coleman's termination."  *Id*. at 191.

Here, in a similar fashion, the Complaint has identified a comparator and made a conclusory allegation as to similarity.  But, it fails to include allegations that create a plausible basis for believing there was actual similarity.

Decisions from other judges in this District support this conclusion.  *See, e.g.*, *Stovall v. H&S Bakery*, TDC-20-3234, 2021 WL 2580746, at *5 (D. Md. June 23, 2021) (dismissing complaint that did not allege whether employee comparators "held the same or similar positions as [the plaintiff], had the same supervisor as him, or were subject to the same standards," nor whether their alleged misconduct was similar); *Walker v. Md. Dep't of Info. and Tech.*, CCB-20-219, 2020 WL 6393435, at *4 (D. Md. Nov. 2, 2020) (dismissing complaint, and noting that the plaintiff "has . . . failed to adequately plead that she was similarly situated in all relevant aspects to her comparators"); *Bynum v. Martin*, GLH-16-2067, 2016 WL 7468050, at *5-6 (D. Md. Dec.

27, 2016) (dismissing complaint that "identifie[d] a number of potential comparators but each has different or mitigating circumstances distinguishing their situations from" plaintiff's); *Parker v. Ciena Corp.*, WDQ-14-4036, 2016 WL 153035, at *5 (D. Md. Jan. 12, 2016) (dismissing complaint with one named comparator but "no information from which to infer that [the comparator] was similarly situated," and noting that "[m]ultiple courts in this circuit have dismissed complaints that have failed to adequately establish the alleged comparators were similar").

Even if the comparator allegations are considered sufficient at the 12(b)(6) stage, *see Holloway*, 2022 WL 1207165, at *3, plaintiff's claims founder as to the requirement for an adverse employment action. As noted, an "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Ellerth*, 524 U.S. at 761). However, "'not everything that makes an employee unhappy is actionable adverse action.'" *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 599 (D. Md. 2011) (quoting *Settle v. Baltimore Cnty.*, 34 F. Supp. 2d 969, 989 (D. Md. 1999)), *aff'd*, 465 Fed. App'x 274 (4th Cir. 2012).

The parties have presented no case law as to whether denial of secondary employment opportunities constitutes an adverse employment action. The Seventh Circuit has held, albeit in the retaliation context and without much discussion, that "refusal to allow [an employee] to pursue secondary employment" could be considered an adverse action. *Silk v. City of Chicago*, 194 F.3d 788, 800 (7th Cir. 1999). In one case in this District, the plaintiff, a police officer, identified an alleged denial of a request for secondary employment as one of several adverse employment actions. *Cherry v. Bealefeld*, CCB-08-1228, 2010 WL 917421, at *3-4 (D. Md. Mar. 9, 2010).

28

But, the defendant did not contest that adverse employment actions had occurred, and Judge Blake granted summary judgment for the defendant on other grounds, without the need to determine whether the denial constituted an adverse action. *Id*. at *3-6.

In any event, by plaintiff's own admission, the defendant ultimately *approved* her secondary employment request. ECF 1, ¶ 30. To be sure, plaintiff alleges that she was required to obtain the approval of the Police Commissioner, rather than lower-level officers. *Id*. ¶¶ 23-29, 36, 58. But, it is difficult to see how this additional bureaucratic hurdle and the brief delay it occasioned, however unwelcome or unfair it might have seemed to plaintiff, could constitute a "'significant change in employment status.'" *Hoyle*, 650 F.3d at 337 (quoting *Ellerth*, 524 U.S. at 761). And, the mere *threat* of discipline—in plaintiff's case, defendant allegedly informing plaintiff that she would be charged with "insubordination and failure to obey command" if she did not resign either from the BPD or her secondary job (ECF 1, ¶ 25)—is not an adverse action unless it actually leads to alterations in the terms and conditions of employment. *See, e.g.*, *Thorn*, 766 F. Supp. 2d at 598; *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003).

Gaines alleges that, following the approval of her request, defendant nevertheless "essentially rejected the modification [sic] work schedule." ECF 1, ¶ 30. And, as a result of this action, plaintiff claims that she was "forced . . . to resign." *Id*. But, the Complaint contains little more than a bare allegation that plaintiff's request to modify her work schedule was "essentially rejected," so as to make it untenable for her to continue employment at the BPD while also pursuing her secondary employment.

The Complaint's allegation that plaintiff was "forced to resign" appears to sound in constructive discharge—*i.e.*, an allegation that when the BPD approved the secondary employment request but then denied the related request to modify plaintiff's work schedule to accommodate

the secondary employer, defendant made it impossible for plaintiff to continue working at the BPD.  Indeed, both parties approach the adverse action question in their briefing from the standpoint of constructive discharge.  *See* ECF 10-1 at 11-12; ECF 11-1 at 4-5; ECF 12 at 12-14.

A claim of constructive discharge arises when an employee resigns because the "circumstances of discrimination" made the employee's working conditions "'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004)).  To establish a claim of constructive discharge, a claimant "must prove first that [s]he was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign" and then show that she actually resigned.  *Green*, 578 U.S. at 555; *see also Perkins v. International Paper Company*, 936 F.3d 196, 211-12 (4th Cir. 2019); *Crockett v. SRA Int'l*, 943 F. Supp. 2d 565, 576 (D. Md. 2013); *Lopez v. BMA Corp.*, DKC-13-2406, 2013 WL 6844361 (D. Md. Dec. 24, 2013).

Regarding the "intolerability" of the work environment, the Fourth Circuit instructed in *Perkins*, 936 F. 3d at 212 (internal quotation marks and citations omitted):

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign. Instead, intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt compelled to resign . . . that is, whether he would have had no choice but to resign.

The "frequency of the conditions at issue" is an important part of the intolerability assessment.  *Evans*, 936 F.3d at 193 (citing *Amirmokri v. Balt. Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir. 1995)).  "The more continuous the conduct, the more likely it will establish the required intolerability.  On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Evans*, 936 F.3d at 193.

30

Intolerability is a high bar.  Without more, "difficult or unpleasant working conditions and denial of management positions . . . are not so intolerable as to compel a reasonable person to resign."  *Id.*; *see also James*, 368 F.3d at 378 ("[M]ere 'dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'") (citation omitted).  Further, constructive discharge requires a greater showing than a claim of hostile work environment.  *See Evans*, 936 F.3d 183, 193; *see also Nnadozie v. Genesis HealthCare Corp.*, 730 Fed. App'x 151, 162 (4th Cir. 2018) ("The 'intolerability' standard governing constructive discharge claims is more stringent than the 'severe and pervasive' standard for hostile work environment claims.").

Gaines has not alleged facts that satisfy the high standard for constructive discharge. Plaintiff is clearly unhappy that it was not possible for her to work at both the BPD and at WBAL, and believes the choice that she was asked to make was unfair.[9]  But, "an employee's dissatisfaction with this or that aspect of work does not mean an employer has committed an actionable adverse action."  *James*, 368 F.3d at 379.

Ultimately, plaintiff appears to allege that although the BPD approved her request to work as a news anchor/reporter, the BPD was not willing to accommodate her by modifying her work schedule, as she requested, so as to actually make the secondary employment feasible.  ECF 1, ¶ 30.  Based on the allegations, this is simply not a situation in which defendant's treatment of plaintiff was "'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'"  *Green*, 578 U.S. at 555 (quoting *Pa. State Police*, 542 U.S. at 148).

---

[9] Again, I note that plaintiff was seeking permission to work in an entirely different field, local journalism, with the potential for a meaningful conflict of interest. This was not an insignificant request.

Indeed, the circumstances, as alleged, fall short of other situations in which the Fourth Circuit has rejected a claim of constructive discharge. *See, e.g.*, *Perkins*, 936 F.3d at 211-12 (employee asserted unfair assignments and employee rankings, being passed over for promotion, and hearing secondhand about racially offensive comments); *Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (employee was yelled at, told he was a poor manager, chastised in front of customers, and required to work on an injured back); *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir. 2001) (employee asserted ostracism by coworkers, denial of management position, and mandatory counseling); *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F. 3d 239, 244 (4th Cir. 1997) (employee was ignored by coworkers and top management); *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (employee was dissatisfied work assignments, and also subjected to unfair criticism and difficult and unpleasant working conditions). And, plaintiff has cited no authority to the contrary—nor, indeed, to any legal authority in her discussion of adverse actions.

In sum, plaintiff has failed plausibly to state claims for race and sex discrimination. However, with additional allegations, plaintiff could state a claim. Therefore, I will grant plaintiff leave to file an Amended Complaint as to Counts I and II.

### B. Count III (Hostile Work Environment)

In Count III, plaintiff brings a claim of hostile work environment on the basis of race and sex discrimination. ECF 1, ¶¶ 76-85. Defendant argues that plaintiff did not exhaust her administrative remedies because such a claim was not contained in her Charge or the Amended Charge, and that, in any event, the facts as alleged do not state a claim for hostile work environment. ECF 10-1 at 13-15.

### 1. Exhaustion

Before filing suit under Title VII, a plaintiff must exhaust administrative remedies.  *See Patterson v. McLean Credit Union*, 491 U.S. 164 (1989) (private sector employees), superseded on other grounds by 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976) (federal employees); *see also McCray v. Md. Dep't of Trans.*, 662 Fed. App'x 221, 224 (4th Cir. 2016).  However, the Supreme Court has said that a plaintiff's failure to exhaust administrative remedies does not divest the court of jurisdiction.  *Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846 (2019).  Rather, exhaustion is a "claim-processing rule," and it is "'mandatory' in the sense that a court must enforce the rule if a party 'properly raises it.'"  *Id.* (cleaned up) (quoting *Eberhart v. United States*, 546 U.S. 12, 19, (2005) (per curiam)).  Although a defendant may waive arguments related to administrative exhaustion, if asserted in a timely fashion such objections may warrant dismissal under Rule 12(b)(6).  *See Kenion v. Skanska USA Bldg., Inc.*, RBD-18-3344, 2019 WL 4393296, at *4 (D. Md. Sept. 13, 2019) (discussing the import of *Davis*).

The exhaustion requirement is not "simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005).  Rather, it advances the "twin objectives" of "protecting agency authority in the administrative process and promoting efficiency in the resolution of claims."  *Stewart v. Iancu*, 912 F.3d 693, 699 (4th Cir. 2019) (internal quotation marks, alterations, and citation omitted).

The administrative exhaustion process has a substantive effect.  Generally, it limits the scope of a plaintiff's federal lawsuit to those parties and claims named in the administrative charge. *See* 42 U.S.C. § 2000e–5(f)(1); *Walton v. Harker*, ___ F.4th ___, 2022 WL 1257128, at *4-6 (4th Cir. Apr. 28, 2022); *Sydnor v. Fairfax Cty.*, 681 F.3d 591, 593 (4th Cir. 2012); *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998); *Evans*, 80 F.3d at 963.  Thus, "when the claims in [the] court

complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge,' they are procedurally barred." *Parker v. Reema Consulting Servs., Inc*., 915 F.3d 297, 306 (4th Cir. 2019) (quoting *Chacko*, 429 F.3d at 508). To illustrate, the Fourth Circuit has stated that a "'claim will . . . typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits.'" *Nnadozie*, 730 Fed. App'x at 161 (quoting *Chacko*, 429 F.3d at 509) (ellipsis in *Nnadozie*).

That said, the EEOC charge "'does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination[.]'" *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005) (internal citation omitted); *see Chacko*, 429 F.3d at 512. And, because "EEOC charges often are not completed by lawyers," the Fourth Circuit has instructed courts to "construe them liberally." *Chacko*, 429 F.3d at 509; *see Sydnor*, 681 F.3d at 594 ("[T]he exhaustion requirement should not become a tripwire for hapless plaintiffs."). Thus, a federal court may hear a claim that was not presented to the EEOC so long as it is "'reasonably related'" to the plaintiff's EEOC charge "'and can be expected to follow from a reasonable administrative investigation . . . .'" *Sydnor*, 681 F.3d at 594 (quoting *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000)); *see also Stewart*, 912 F.3d at 705; *Miles*, 429 F.3d at 491 (noting that EEOC charge "'does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination'") (quoting *Bryant*, 288 F.3d at 132).

In my view, plaintiff has not exhausted her hostile work environment claim. The claim is premised on Davis's "verbal harassment" of plaintiff, in presenting her a choice of remaining in

the BPD, continuing her secondary employment, or facing disciplinary charges.  ECF 1, ¶ 78.

Plaintiff asserts that this conduct "created a hostile, offensive, and intimidating work

environment," that was "severe, hostile, and pervasive."  *Id.* ¶¶ 79, 80.

The Fourth Circuit has "held that the allegation of a discrete act or acts in an administrative

charge is insufficient when the plaintiff subsequently alleges a broader pattern of misconduct."

*Chacko*, 429 F.3d at 509.  As another court has said: "[C]ourts do not require a plaintiff to have

invoked a hostile work environment claim by name or to use specific 'magic words' in order to

exhaust it.  But typically the plaintiff must offer at least *some* suggestion of a hostile work

environment in the charge narrative, such as by referring to an ongoing pattern of conduct or

describing a workplace pervaded by abuse."  *Congress v. District of Columbia*, 324 F. Supp. 3d

164, 171 (D.D.C. 2018) (internal citation omitted) (emphasis in original).  *See also, e.g.*, *Kenion

v. Skanska USA Building, Inc.*, RDB-18-3344, 2019 WL 4393296, at *6-7 (D. Md. Sept. 13, 2019)

(no exhaustion when "charge does not mention harassment and is devoid of a single reference to

conduct which could give rise to a hostile work environment claim"); *Byington v. NBRS Financial

Bank*, 903 F. Supp. 2d 342, 351 (D. Md. 2012) (finding that "generalized allegation of 'harassment'

in the administrative charge" was "void of the specifics necessary to put [the defendant] on

notice").

Plaintiff's Amended Charge recounted her attempt to gain approval for secondary

employment, and alleged that when she requested an explanation from Davis for why other officers

obtained approval at the Shift Commander level, she was "mandated to either terminate [her]

secondary employment or resign from the Police Department or be charge [sic] for

insubordinations [sic], and failure to obey command."  ECF 10-6 at 1.  The dates for the

discrimination were given as between September 28, 2017, and October 26, 2017, and the

"Continuing Action" box was not checked.  *Id*.  The Amended Charge also mentions the rehiring allegation.  *Id*. at 1-2.  However, the Amended Charge contains no indication that plaintiff was asserting an ongoing course of conduct; harassment; or pervasive abuse.  And, examination of the Amended Charge would not suggest to the BPD that plaintiff was asserting a claim of hostile work environment.  To the contrary, the Amended Charge presents the approval process, and the ultimatum offered by Davis to plaintiff, as a discrete incident—a classic allegation of disparate treatment.  The same is true for the rehiring.

I conclude that a hostile work environment claim would not "'reasonably be expected to follow'" the Amended Charge.  *Miles*, 429. F.3d at 491 (internal citation omitted).  However, as discussed below, even if the claim were considered exhausted, plaintiff has not adequately stated a claim based on hostile work environment.

### 2. Merits

Under Title VII, to state a claim of hostile work environment, a plaintiff must allege that the conduct of the employer: (1) was unwelcome; (2) resulted because of her gender, race, or prior protected status; (3) was "'sufficiently severe or pervasive' to alter the conditions" of her employment; and (4) was "imputable to [her] employer." *Pueschel v. Peters*, 577 F.3d 558, 564-65 (4th Cir. 2009) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 338 (4th Cir. 2003) (en banc)); *see Roberts*, 998 F.3d at 117; *Evans*, 936 F.3d at 192.

The first element, unwelcome conduct, "is not a high hurdle." *Strothers*, 895 F.3d at 328.  The Fourth Circuit has explained that "an employee can demonstrate that certain conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer." *Id.* at 328-29.  And, "the nature of the conduct may indicate whether or not the conduct is unwelcome." *Id.* at 329.

36

To satisfy the second element of a hostile work environment claim, the plaintiff must allege that she was harassed or otherwise discriminated against "because of" her protected class. 42 U.S.C. § 2000e–2; *see also Ocheltree*, 335 F.3d at 331; *First Union Nat. Bank*, 202 F.3d at 242. The plaintiff may satisfy this burden by showing that, "but for" her protected class, she would not have suffered discrimination. *Id*. at 242.

Animosity may be shown by "differential treatment of similarly situated . . . employees," but "conclusory statements, without specific evidentiary support, cannot support an actionable claim for harassment." *Causey*, 162 F.3d at 801-02. And, "harassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to [the plaintiff's protected class], manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008).

As to the third element, a hostile work environment exists when the "'workplace [is] permeated with discriminatory intimidation, ridicule, and insult[.]'" *Boyer-Liberto*, 786 F.3d at 281 (some quotations and citation omitted) (quoting *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006)); *see Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993); *Nnadozie*, 730 Fed. App'x at 158. The Fourth Circuit has stated that the plaintiff must allege that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (citing *Harris*, 510 U.S. at 22).

The "severe or pervasive" requirement has both subjective and objective components. *See Harris*, 510 U.S. at 21-22; *Jessup v. Barnes Group, Inc.*, 23 F.4th 360, 368 (4th Cir. 2022); *Roberts*, 998 F.3d at 117; *Perkins*, 936 F.3d at 207-08; *Strothers*, 895 F.3d at 331; *EEOC. v. Cent. Wholesalers Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). In particular, "the plaintiff must show that the work environment was not only subjectively hostile, but also objectively so." *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011). And, "[w]hether the environment is objectively hostile or

abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)); *see Irani*, 767 Fed. App'x at 416; *Nnadozie*, 730 Fed. App'x at 158. However, the plaintiff does not need to demonstrate that the work environment is "psychologically injurious." *Boyer-Liberto*, 786 F.3d at 277.

Notably, "viable hostile work environment claims often involve repeated conduct. . . . because, 'in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'" *Boyer-Liberto*, 786 F.3d at 277 (citation omitted); *see Irani*, 767 Fed. App'x at 416. But, "an 'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'" *Boyer-Liberto*, 786 F.3d at 277 (alterations in original) (citation omitted).

The Court stated in *Perkins*, 936 F.3d at 208: "'[W]hen determining whether the harassing conduct was objectively severe or pervasive, we must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" (Alteration in original) (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008)). However, "'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Perkins*, 936 F.3d at 208 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Likewise, the "'[m]ere utterance of an . . . epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment[.]" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21) (other citations omitted). And, "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by

[one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable." *Sunbelt Rentals*, 521 F.3d at 315-16 (internal quotation marks and citations omitted); *see Nnadozie*, 730 Fed. App'x at 161-62.

Of import here, "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals." *Boyer-Liberto*, 786 F.3d at 278 (citation omitted); *see also E.E.O.C. v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) ("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'") (citation omitted); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 697 (4th Cir. 2007) (en banc) ("Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment.").

At bottom, the determination as to "severe and pervasive" is not, and "'by its nature cannot be, a mathematically precise test.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). Consequently, "no single factor is dispositive, as the real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23, and *Oncale*, 523 U.S. at 81-82) (cleaned up).

The alleged facts, taken as true, do not rise to the level of conduct that is "'sufficiently severe or pervasive' to alter the conditions" of plaintiff's employment. *Id.* (quoting *Ocheltree*, 335 F.3d at 338). The Complaint identifies only one event as contributing to the alleged hostile work environment: that plaintiff "was subjected to verbal harassment when she was told by Commissioner Kevin Davis that she must either terminate her secondary employment, resign from

BPD, or be charged with insubordination and failure to obey command, based on her statutorily protected class as an African American woman." ECF 1, ¶ 78. Plaintiff asserts that this conduct "created a hostile, offensive, and intimidating work environment." *Id*. ¶ 79. Although the Complaint labels this conduct as "harassment," there is no allegation that any conduct by Davis was unprofessional, rude, or abusive in any way. Rather, plaintiff simply disagreed with the choice that was being presented to her.

As alleged, plaintiff requested permission to engage in secondary employment in an entirely different field. ECF 1, ¶ 21. Despite approval by Davis's subordinates, Davis denied permission, and plaintiff was allegedly told that she either had to leave the BPD or leave her secondary employment in order to remain at the BPD, or else she would face discipline. *Id*. ¶¶ 22-26. Plaintiff raised concerns of discrimination, at which point Davis reversed himself and approved the request. *Id*. ¶¶ 27-30. But, he did not approve a modification of plaintiff's work schedule, thereby "forcing" plaintiff to quit in order to pursue the secondary employment. *Id*. ¶ 30. In other words, plaintiff wanted a work schedule with BPD, her primary employer, that would meet the needs of her secondary employer.

Again, plaintiff might disagree with the decisions of defendant; she believes that she was treated unfairly. But, these circumstances hardly constitute a "'workplace [that is] permeated with discriminatory intimidation, ridicule, and insult[.]'" *Boyer-Liberto*, 786 F.3d at 281 (some quotations and citation omitted) (quoting *Jordan*, 458 F.3d at 339). Instead, plaintiff navigated the bureaucratic requirements of the BPD over a period of approximately one month, not always receiving the answer she wanted. But, assertions by plaintiff of harassing, severe, or pervasive conduct are conclusory, at best.

Indeed, courts have declined to find a hostile work environment based on workplace conduct far more egregious than what is alleged here. *Cf. Buchhagen v. ICF Int'l, Inc*., 545 Fed. App'x 217, 219 (4th Cir. 2013) (per curiam) (stating that allegations of a supervisor mockingly yelling at the plaintiff in a meeting, "repeatedly harping on a mistake" by the plaintiff, and "unfairly scrutinizing and criticizing" plaintiff's failure to follow directives, fall "far short of being severe or pervasive enough to establish an abusive environment" (internal alterations omitted)); *Vincent v. MedStar S. Md. Hosp. Ctr*., No. 16-cv-1438-TDC, 2017 WL 3668756, at *9-10 (D. Md. Aug. 22, 2017) (finding plaintiff failed to allege hostile work environment where supervisor yelled at employee, called her "stupid," refused to communicate with her, and restricted her access to the computer system); *Tims v. Carolinas Healthcare Sys*., 983 F. Supp. 2d 675, 680-81 (W.D.N.C. 2013) (granting motion to dismiss where plaintiff alleged supervisor referred to her as "you people" and "y'all blacks" because "isolated comments do not rise to the level of severity necessary to alter the terms and conditions of employment"). Moreover, "[d]isagreements with management decisions . . . do not rise to the level of a hostile work environment." *Spida v. BAE Sys Info. Sols., Inc*., No. 1:16-cv-979, 2016 WL 7234088, at *6 (E.D. Va. Dec. 13, 2016).

In the Opposition, plaintiff refers to her hostile work environment claim as "based on retaliation." ECF 11-1 at 7. But, Count III of the Complaint—the only one for hostile work environment—plainly asserts discrimination, rather than retaliation. *See* ECF 1, ¶ 78 (alleging harassment "because of [plaintiff's] statutorily protected class as an African American woman."). And, plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint." *Zachair Ltd.*, 965 F. Supp. at 748 n. 4.

Plaintiff also uses her Opposition to assert that plaintiff was "consistently pressured and told that she must either resign or be charged with insubordination," and was "left drowning in a

known hostile work environment that was permitted to thrive, where one's race and sex seemingly dictated management's treatment of you and the standards that they held you to."  ECF 11-1 at 7-8.  Again, the Court must look to the allegations in the Complaint, not plaintiff's dramatic rephrasing of these allegations in her Opposition.

Simply put, plaintiff has not stated a claim for hostile work environment.  And, because she did not exhaust her administrative remedies as to such a claim, I will not grant leave to amend the Complaint as to Count III.

### C. Count IV (Retaliation)

Count IV of the Complaint alleges retaliation under Title VII.  Specifically, plaintiff alleges that she was "subjected to retaliation" after complaining to the EEOC regarding her rehiring allegations.  ECF 1, ¶ 88; *see id*. ¶¶ 86-109.  Defendant argues that plaintiff has not alleged a causal connection between her protected activity and any adverse action.  ECF 10-1 at 15-16.

#### 1. Title VII Retaliation Principles

As indicated, Title VII contains protections against retaliation by an employer against an employee for engaging in certain kinds of protected activity.  And, the *McDonnell Douglas* proof scheme applies to a retaliation claim.  *Smith v. CSRA, Inc.*, 12 F.4th 396, 416 (4th Cir. 2021).  Thus, "[a] plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the [*McDonnell Douglas*] burden-shifting framework."  *Strothers*, 895 F.3d at 327 (citing *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)).

To state a prima facie claim of retaliation, a plaintiff must allege "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the

employer's adverse action.'" *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (citation

omitted); *see Sempowich*, 19 F.4th at 653; *Roberts*, 998 F.3d at 122; *Kitlinski*, 994 F.3d at 232;

*Strothers*, 895 F.3d at 327; *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 217

(4th Cir. 2016); *Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 Fed. App'x 146, 151 (4th Cir. 2017);

*Foster*, 787 F.3d at 250; *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 578

(4th Cir. 2015).

As noted, "in the context of a retaliation claim, a 'protected activity' may fall into two

categories, opposition and participation." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406

(4th Cir. 2005); *see Netter*, 908 F.3d at 937.  "An employer may not retaliate against an employee

for participating in an ongoing investigation or proceeding under Title VII, nor may the employer

take adverse employment action against an employee for opposing discriminatory practices in the

workplace." *Laughlin*, 149 F.3d at 259; *see* 42 U.S.C. § 2000e-3(a).

"Protected activity under Title VII includes complaints of discrimination based upon 'race,

color, religion, sex or national origin.'" *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013)

(citation omitted).  And, "[c]omplaints raised through internal company procedures are recognized

as protected activity." *Roberts*, 998 F.3d at 122.  As the Fourth Circuit has said, "[t]o fall under

the protection of the opposition clause . . . behavior need not rise to the level of formal charges of

discrimination. The opposition clause has been held to encompass informal protests, such as

voicing complaints to employers or using an employer's grievance procedures." *Armstrong v.

Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) (citation omitted); *see Laughlin*, 149 F.3d at

259 ("Opposition activity encompasses utilizing informal grievance procedures as well as staging

informal protests and voicing one's opinions in order to bring attention to an employer's

discriminatory activities.")  But, "for an employee's activity to constitute protected 'opposition,'

she must show (1) that she reasonably believed that the employment action she opposed constituted a Title VII violation, and (2) that her conduct in opposition was reasonable." *Netter*, 908 F.3d at 937-38.

The second element is that of an "adverse action." In general, an adverse employment action is one that adversely affects the terms, conditions, or benefits of employment. *Roberts*, 998 F.3d at 122. However, in *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added.) In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.*; *see also Burlington Northern*, 548 U.S. at 64 ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."); *Barnes v. Charles Cty. Pub. Schools*, 747 Fed. App'x 115, 119 (4th Cir. 2018) (per curiam) ("An adverse action need not affect the terms and conditions of employment" in a retaliation claim.) Thus, "[t]he scope of Title VII's anti-retaliation provision . . . is broader than the anti-discrimination provision." *Strothers*, 895 F.3d at 327.

Nevertheless, there must be "some direct or indirect impact on an individual's employment . . . ." *Adams*, 789 F.3d at 431. So, "retaliatory actions do have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68).

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67; *see also Ray*, 909 F.3d at 667. In other words, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548

U.S. at 68).  Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).  But "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions.  *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

Judge Grimm has explained: "Even with this lower bar [for retaliation], none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an Attendance Warning,' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'"  *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (internal citations omitted).  This passage has been widely cited in this District.  *See, e.g.*, *Draughn v. Wormuth*, RDB-20-3625, 2021 WL 5742236, at *8 (D. Md. Dec. 1, 2021); *Kelly v. Berryhill*, RDB-18-0049, 2019 WL 1300816, at *5 (D. Md. Mar. 20, 2019); *Lockley v. Town of Berwyn Heights*, JFM-14-825, 2015 WL 5334256, at *11 (D. Md. Sept. 11, 2015).  But, the Fourth Circuit has also ruled that "a letter of warning did amount to an adverse action because [plaintiff's supervisor] warned [plaintiff] that future disciplinary actions could result in further discipline, including termination."  *Barnes*, 747 Fed. App'x at 119.

To establish causation under Title VII, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer."  *Nassar*, 570 U.S. at 360; *see also Irani*, 767 Fed. App'x at 421.  The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual."  *Netter*, 908 F.3d at 938; *see Foster*, 787 F.3d at 249.  This

requirement of but-for causation imposes a higher burden on a plaintiff than the mixed-motive requirement in Title VII's antidiscrimination provision. *See Foster*, 787 F.3d at 249-50.

Nevertheless, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335; *see CSRA*, *Inc.*, 12 F.4th at 417.   Indeed, "'[v]ery little evidence of a causal connection is required to establish a prima facie case [of retaliation].'" *Burgess v. Bowen*, 466 Fed. App'x 272, 283 (4th Cir. 2012) (citation omitted; alterations in *Burgess*); *see CSRA*, *Inc.*, 12 F.4th at 417; *Roberts*, 998 F.3d at 127.   As the Fourth Circuit explained in *Foster*, 787 F.3d at 250-52, "*Nassar* [did] not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim," because it did not require establishing but-for causation at the prima facie stage, and but-for causation is already required at the pretext stage.

"A plaintiff may attempt to demonstrate that a protected activity caused an adverse action [at the prima facie stage] 'through two routes.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson v. United Parcel Service, Inc.*, 839 Fed. App'x 781, 783-84 (4th Cir. 2021)); *see CSRA*, *Inc.*, 12 F.4th at 417.   "A plaintiff may establish the existence of facts that 'suggest[] that the adverse action occurred because of the protected activity.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson*, 839 Fed. App'x at 783-84); *see Lettieri*, 478 F.3d at 650 (recognizing that relevant evidence may be used to establish causation).   Or, a plaintiff may demonstrate that "the adverse act bears sufficient temporal proximity to the protected activity." *Johnson*, 839 Fed. App'x at 784 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)).   And, "[t]he existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action." *Roberts*, 998 F.3d at 123.

To be sure, "temporal proximity suffices to show a causal relationship." *Sempowich*, 19 F.4th at 654.   In *Strothers*, 895 F.3d at 335-36, the Court said: "An employee may establish *prima*

*facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *See also Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) ("In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity.") (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

For the temporal route, there naturally must exist "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501. Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). And, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n. 5 (4th Cir. 2003)). Moreover, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc*., 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

But, as indicated, temporal proximity is not the sole avenue to allege and later show causation. *CSRA, Inc.*, 12 F. 4th at 417. Rather, temporal proximity is one of two paths to show

causation.  As noted, the other path contemplates "the existence of facts that 'suggest[] that the adverse action occurred because of the protected activity.'"  *Roberts*, 998 F.3d at 123 (citation omitted).

## 2. Analysis

Count IV of the Complaint, asserting retaliation, is specific as to the basis for the retaliation claim.  In relevant part, the Complaint asserts (ECF 1, ¶ 88) (emphases added):

> Here, Plaintiff was retaliated against *after reporting discrimination to the EEOC*.  Soon after complaining of discrimination, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.  *Specifically, Plaintiff complained of discrimination where Plaintiff complained to the EEOC that Commissioner Kevin Davis, told Plaintiff that upon her return, her supervisor status as sergeant would not be an option*. . . .  After Plaintiff's statutorily protected activity, she was subjected to retaliation, including but not limited to, where *Plaintiff was forced to resign*, even though similarly situated Caucasian male employees such as Officer Zimmerman were allowed to obtain secondary employment approval through their Shift Commander, and not forced to resign like Plaintiff.

In other words, the protected activity forming the basis of the retaliation claim is that plaintiff reported her allegations as to rehiring to the EEOC.  No other protected activity is mentioned anywhere in Count IV.

As defendant notes (ECF 10-1 at 15-16), there is an obvious problem with this claim: this protected activity occurred *after* any alleged adverse action.  Plaintiff's attempt to obtain approval for her secondary employment culminated in her resignation from the BPD on October 28, 2017.  ECF 1, ¶ 31.  Plaintiff then filed her Charge with the EEOC on November 6, 2017, more than a week later.  ECF 1, ¶ 7; *see* ECF 10-3.  And, plaintiff's Charge did not mention the rehiring issue until it was amended on May 25, 2018.  ECF 1, ¶ 7; *see* ECF 10-6.  There is no other alleged event or circumstance in which plaintiff reported the rehiring issue to the EEOC, or indeed reported discrimination to the EEOC at all.

48

Clearly, defendant could not have retaliated against plaintiff for engaging in protected activity before that protected activity occurred.   *See Gibson v. Marjack Co., Inc.*, 718 F. Supp. 2d 649, 655 (D. Md. 2010) ("To establish a causal connection between a protected activity and an adverse action, a plaintiff must prove that the protected activity *preceded* the adverse action and that the employer knew the employee engaged in a protected activity.") (emphasis added).  On this basis, Count IV fails to state a claim as to retaliation.

In the Opposition, plaintiff does not even attempt to defend the substance of Count IV. Instead, plaintiff asserts a completely different retaliation claim.  *See* ECF 11-1 at 8-9.  In the Opposition, plaintiff argues that, in fact, her protected activity occurred after Davis denied her secondary employment request, when she requested an explanation from Davis as to why similarly situated Caucasian male employees did not need approval from Davis for their secondary employment requests.  *See* ECF 11-1 at 8-9; ECF 1, ¶¶ 28, 29.  Remarkably, plaintiff states: "Defendant's mischaracterization of Plaintiff's claims is a blatant attempt to misdirect this Court into misreading Plaintiff's allegations."  ECF 11-1 at 9.  In reality, the text of Count IV is explicit as to plaintiff's retaliation claim, and defendant was merely responding to the count.

Plaintiff's request for an explanation from Davis likely constituted protected opposition activity.  *See Laughlin*, 149 F.3d at 259 ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.").  And, unlike her complaints to the EEOC, it occurred before plaintiff's resignation.

On the other hand, it is not clear that this solves plaintiff's causation problem.  At the time plaintiff sought an explanation, Davis had denied Gaines's request for secondary employment.  *See Id*. ¶¶ 22-29.  But, "[a]fter Plaintiff documented her discrimination, BPD rescinded their [sic]

disapproval and approved the secondary employment request again." ECF 1, ¶ 30.  In other words, plaintiff's situation actually *improved* after her protected activity.  Indeed, plaintiff concedes as much in her Opposition.  *See* ECF 11-1 at 9 ("Defendant only approved the request *after* she pushed back against their disparate treatment of her . . . .") (emphasis in original).

To be sure, plaintiff then alleges that, at some later point, defendant "rejected the modification work schedule." *Id*. ¶ 30.  Still, this is not the usual course of events for a retaliation claim.

In any event, this is simply not the retaliation claim asserted in the Complaint.  Count IV of the Complaint, the only one to claim retaliation, is explicit as to the basis of the claim: that plaintiff "complained to the EEOC" as to the rehiring issue, and she was subsequently subjected to retaliation.  *Id*. ¶ 88.  This is the argument to which defendant responded in the Motion.  And, the Complaint was prepared by counsel, presumably with some care and attention.  A plaintiff "is bound by the allegations contained in [her] complaint and cannot, through the use of motion briefs, amend the complaint." *Zachair Ltd.*, 965 F. Supp. at 748 n.4; *see also So. Walk at Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 18 ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."); *Haddad v. M&T Bank*, PJM-13-3542, 2014 WL 1870850, at *4 (D. Md. May 6, 2014) ("Plaintiffs cannot, in a brief in opposition to a motion to dismiss, amend a complaint and recharacterize its claims."); *Mylan Labs., Inc.*, 770 F. Supp. at 1068 ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'") (internal citation omitted).

Accordingly, I will grant the Motion as to Count IV.  However, because plaintiff apparently seeks to advance a different retaliation claim than the one asserted in Count IV, I will grant plaintiff leave to amend as to this claim.

### D. Count V (Section 1981)

Count V of the Complaint asserts a claim under 42 U.S.C. § 1981 for "the unlawful conduct and adverse actions alleged throughout this Complaint," to the extent that this conduct was because of plaintiff's race.  ECF 1, ¶ 112.

Defendant argues that plaintiff's claim should be brought under 42 U.S.C. § 1983, because it is against a state actor.  ECF 10-1 at 16.  Further, defendant contends that even if the claim were properly pled, plaintiff has failed to state a claim under § 1983.  *Id.*  Plaintiff's Opposition does not respond in any meaningful way to these arguments, merely explaining that, as a general matter, § 1981 claims are generally evaluated under the same framework as Title VII claims.  ECF 11-1 at 9-10.

In relevant part, § 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws . . . as is enjoyed by white citizens[.]"   42 U.S.C. § 1981(a).   Among other things, "§ 1981 . . . prohibits discrimination in employment on the basis of race."  *Yashenko v. Harrah's N.C. Casino Co., LLC*, 446 F.3d 541, 551-52 (4th Cir. 2006); *see Johnson v. Ry. Express Agency, Inc*., 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination . . . on the basis of race."); *Nnadozie*, 730 Fed. App'x at 156.

For its part, under 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g., Nieves v. Barlett*, ___ U.S. ___, 139 S. Ct. 1715, 1721 (2019); *Filarsky v. Delia*, 566 U.S. 377, 383 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom.*

*Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source

of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"

*Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3

(1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

      Defendant is correct that plaintiff's claim is properly brought under § 1983, not § 1981.  In

*Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), the Supreme Court stated: "We

hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights,

privileges, or immunities secured by the Constitution and laws,' provides for the exclusive federal

damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed

against a state actor."  *Id*. at 735.[10]  Following *Jett*, the Fourth Circuit has instructed that "the §

1983 requirement that plaintiffs show an official policy or custom of discrimination also controls

in § 1981 actions against state entities."  *Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156 (4th Cir.

1995); *see also Lewis v. Robeson Cty.*, 63 Fed. App'x 134, 138 (4th Cir. 2003) (same); *Farmer v.

Ramsay*, 43 Fed. App'x 547, 553 n.8 (4th Cir. 2002) (observing that a plaintiff suing a state or

municipal actor "has no cause of action based on § 1981 independent of § 1983"); *Windsor v. Bd.

of Educ. of Prince George's Cty.*, TDC-14-2287, 2016 WL 4939294, at *12 (D. Md. Sept. 13,

2016); *Victors v. Kronmiller*, 553 F. Supp. 2d 533, 541-44 (D. Md. 2008).

      Briefly, § 1983 suits by individuals against a state for money damages are barred by the

state sovereign immunity embodied in the Eleventh Amendment.  *See Quern v. Jordan*, 440 U.S.

332, 345 (1979).  But, the weight of authority in this District holds that, although the BPD is a

state entity for purposes of Maryland law, it is a municipal entity for purposes of § 1983.  *See, e.g.*,

---

      [10] "State actor" in this context refers more broadly to state action, whether by "state or
municipal entities." *Stout v. Reuschling*, TDC-14-1555, 2015 WL 1461366, at *6 (D. Md. Mar.
27, 2015).

*Earl v. Taylor*, CCB-20-1355, 2021 WL 4458930, at *3 (D. Md. Sept. 29, 2021); *Lucero v. Early*, GLR-13-1036, 2019 WL 4673448, at *4 (D. Md. Sept. 25, 2019); *Bumgardner v. Taylor*, RBD-18-1438, 2019 WL 1411059, at *5 (D. Md. Mar. 28, 2019); *Fish v. Mayor and City of Balt.*, CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018); *Chin v. City of Balt.*, 241 F. Supp. 2d 546, 548 (D. Md. 2003); *Alderman v. Balt. Police Dep't*, 952 F. Supp. 256, 258 (D. Md. 1997).

Sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta by and through Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)). Indeed, as judges of this court have consistently explained in the cases cited above, the BPD does not enjoy Eleventh Amendment sovereign immunity for purposes of a § 1983 claim. This is because it is "sufficiently concerned with local matters, independently funded, interconnected with local government, and autonomous from state government . . . ." *Earl*, 2021 WL 4458930, at *3. To the contrary, BPD is a "person" subject to suit under § 1983. *See*, *e.g.*, *Fish*, 2018 WL 348111, at *3.

The Supreme Court determined in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government resulting in a violation of the plaintiff's rights. *Id.* at 690-91. The *Monell* Court explained that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). But, liability attaches "only where the

municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S.

378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 Fed. App'x 797, 799

(4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis

in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the
> governmental body itself "subjects" a person to a deprivation of rights or "causes"
> a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't
> of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). But,
> under § 1983, local governments are responsible only for "their *own* illegal acts."
> *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986)
> (citing *Monell*, 436 U.S. at 665-683, 98 S. Ct. 2018). They are not vicariously liable
> under § 1983 for their employees' actions. *See id.*, at 691, 98 S. Ct. 2018; *Canton*,
> 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520
> U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 [] (1997) (collecting cases).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had

an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a

violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*,

520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 446, 451 (4th Cir. 2004); *Lytle

v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

However, a municipality cannot be held liable in a § 1983 action under a theory of

respondeat superior. *Monell*, 436 U.S. at 693-94. Rather, "[i]t is well established that in a § 1983

case a city or other local governmental entity cannot be subject to liability at all unless the harm

was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*,

___ U.S. ___,  138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport

News*, 743 F.2d 227, 229 (4th Cir. 1984).  In other words, a municipality is liable when a "policy

or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force'

behind the particular constitutional violation."  *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir.

1987) (internal citations omitted); *see Moore v. Howard Cty. Police Dep't*, CCB-10-1430, 2010 WL 4722043, at *2 (D. Md. Nov. 15, 2010).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty*., 520 U.S. at 403-04.

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted). In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

Notably, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 Fed. App'x at 799. In addition, "a policy or custom may possibly be inferred from

continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan*, 743 F.2d at 229 (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that, to establish a *Monell* claim, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (Quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

In this case, plaintiff has not even come close to asserting any sort of official policy or custom by the BPD that might give rise to liability. Nor does she argue in her Opposition that she has done so. *See* ECF 11-1 at 9-10. Instead, she essentially seeks to hold defendant accountable

under a theory of respondeat superior for a series of specific incidents.  But, this is impermissible for a municipal entity under *Monell*.  *See* 436 U.S. at 693-94.

To be sure, the Complaint contains a cursory reference to the BPD's "widespread constitutional violations, the targeting of African Americans, and a culture of retaliation," and attempts to place plaintiff's case in that context.  ECF 1, ¶ 1.  However, aside from this single, vague reference to the overall institutional problems of the BPD, plaintiff makes no allegations as to how the discrimination she asserts is connected to these broader issues.  In addition, the Complaint references asserted BPD policies as to the approval process for secondary employment requests.  *Id*., ¶¶ 22, 23.  But, these policies are not alleged to be unconstitutional.  Instead, the alleged discrimination against plaintiff took the form of the specific way in which defendant approached her secondary employment request.

Under *Monell*, "'municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.'"  *Love-Lane*, 355 F.3d at 782 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).  "To hold a municipality liable for a single decision (or violation), the decisionmaker must possess 'final authority to establish municipal policy with respect to the action ordered.'"  *Love-Lane*, 355 F.3d at 782 (quoting *Pembaur*, 475 U.S. at 481).  Thus, liability under § 1983 accrues to a municipality only if the governing body of the municipality "retain[s] final review authority" over the "personnel decision."  *Love-Lane*, 355 F.3d at 782.

Plaintiff alleges certain actions by Police Commissioner Davis, namely that he denied her secondary employment request after it was originally approved by lower-level officers, before reversing himself when she raised the issue of discrimination.  ECF 1, ¶¶ 22-30.  It is possible that Davis, as the Police Commissioner, could be considered the decisionmaker with "'final authority

to establish . . . policy with respect to the action ordered.'"  *Love-Lane*, 355 F.3d at 782 (quoting *Pembaur*, 475 U.S. at 481).  The Complaint makes no explicit allegations as to this issue. However, this seems to be implicit in Davis's position that his personal approval was required for all secondary employment requests.  *See* ECF 1, ¶¶ 22, 23.

Even assuming that conduct by Davis falls within the ambit of *Monell*, plaintiff has failed to state a claim.  The framework of proof for claims of intentional employment discrimination brought under § 1981 and § 1983 is the same as the framework applicable to a Title VII claim. *See Love-Lane*, 355 F.3d at 786 (stating, in case involving employment discrimination claim under Title VII, § 1981, and § 1983, that "the elements required to establish such a case are the same under all three statutes") (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 n. 1 (1993)). But, because plaintiff has failed to state a claim for discrimination under Title VII, as discussed above, she has also failed to state any claim under § 1981 and § 1983 in this context.

Therefore, I will dismiss Count V.  However, because plaintiff could, in theory, cure these deficiencies through an appropriate pleading, I will grant leave to file an Amended Complaint as to this claim.

### E. Count VI (FEPA)

Count VI of the Complaint is brought under FEPA.  Plaintiff alleges that, in violation of FEPA, she was "subjected to harassment or offensive conduct that is based on race and sex, where Plaintiff was forced to resign, even though similarly situated Caucasian male employees such as Officer Zimmerman were allowed to obtain secondary employment approval through their Shift Commander, and not forced to resign like Plaintiff."  ECF 1, ¶ 125.

FEPA is the State law analogue to the federal employment discrimination statutes.  *See Lowman v. Maryland Aviation Admin.*, JKB-18-1146, 2019 WL 133267, at *4 (D. Md. Jan. 8,

2019) (recognizing that FEPA "'is the state analogue of Title VII'") (citation omitted).  Moreover, Maryland courts "'traditionally seek guidance from federal cases in interpreting [it].'"  *Eubanks v. Mercy Medical Center, Inc.*, WDQ-15-513, 2015 WL 9255326, at *7 (D. Md. Dec. 17, 2015) (brackets added) (quoting *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 481 (914 A.2d 735, 742 (Md. 2007)) (construing former Article 49B of the Maryland Code).

Neither party has identified any relevant difference between FEPA and Title VII. Therefore, because I have dismissed plaintiff's Title VII claims for failure to state a claim, I will do the same for Count VI.  And, I will grant plaintiff leave to amend as to Count VI.

In addition, defendant argues that plaintiff did not comply, nor plead compliance with, the notice requirements of the Local Government Tort Claims Act ("LGTCA"), Md. Code (2020 Repl. Vol., 2021 Supp.), §§ 5-301 *et seq*. of the Courts and Judicial Proceedings Article ("C.J.").  ECF 10-1 at 18 n.3.

The LGTCA is contained in Title 5, Subtitle 3 of the Courts and Judicial Proceedings Article of the Maryland Code.  It provides, *inter alia*, that "a local government shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment with the local government."  C.J. § 5-303(b)(1).  "With the enactment of the LGTCA, the [Maryland] Legislature sought to provide 'a remedy for those injured by local government officers and employees, acting without malice in the scope of their employment, while ensuring that the financial burden of compensation is carried by the local government ultimately responsible for the public officials' acts.'"  *Rios v. Montgomery County*, 157 Md. App. 462, 475-76, 852 A.2d 1005, 1012 (2004) (quoting *Ashton v. Brown*, 339 Md. 70, 108, 660 A.2d 447, 466 (1995)), *aff'd,* 386 Md. 104, 872 A.2d 1 (2005).

Section 5-304 of the LGTCA provides that "an action for unliquidated damages may not be brought against a local government or its employees unless the notice of the claim . . . is given within 1 year after the injury."  C.J. § 5-304(b)(1).  The notice must "be in writing and shall state the time, place, and cause of the injury."  C.J. § 5-304(b)(2).  Notice "shall be given in person or by certified mail, return receipt requested, bearing a postmark from the United States Postal Service, by the claimant or the representative of the claimant."  C.J. § 5-304(c)(1).

Where applicable, "notice is a condition precedent to the right to maintain an action for damages, and compliance with the notice provision should be alleged in the complaint as a substantive element of the cause of action."  *Renn v. Bd. of Comm'rs of Charles Cty*, 352 F. Supp. 2d 599, 603 (D. Md. 2005).  In *Hansen v. City of Laurel*, 420 Md. 670, 25 A.3d 122 (2011), the Maryland Court of Appeals said: "A plaintiff must not only satisfy the notice requirement strictly or substantially, but also plead such satisfaction in his/her complaint.  If a plaintiff omits this step, he or she is subject to a motion to dismiss, for instance, based on a failure to state a claim upon which relief can be granted."  *Id*. at 694, 25 A.3d at 137.

The BPD is included in the list of local governments that falls within the ambit of the LGTCA.  *See* C.J. § 5-301(d)(21).  And, contrary to plaintiff's assertion that the LGTCA does not apply to her suit (ECF 11-1 at 11), courts have consistently enforced the LGTCA's notice requirements in the context of employment discrimination claims.  *See, e.g.*, *Bozarth v. Md. Dep't of Educ.*, DLB-19-3615, 2021 WL 1225448, at *8 (D. Md. Mar. 31, 2021); *Edwards v. Montgomery College*, TDC-17-3802, 2018 WL 4899311, at *7-9 (D. Md. Oct. 9, 2018); *Young v. Housing Auth. of Balt. City*, MJG-17-713, 2017 WL 5257127, at *6 (D. Md. Nov. 13, 2017); *Hansen*, 420 Md. at 681-94, 25 A.3d at 129-38 (county nondiscrimination ordinance).

But, "strict compliance with the notice provisions of the LGTCA is not always required; substantial compliance may suffice." *Renn*, 352 F.Supp.2d at 603 (internal quotation marks and citations omitted).  Substantial compliance is satisfied "[w]here the purpose of the notice requirements is fulfilled, but not necessarily in a manner technically compliant with all of the terms of the statute." *Id.* (internal quotation marks and citations omitted).  And, in the context of employment discrimination, some courts have held that notice of an EEOC charge constitutes substantial compliance, at least if notice is provided to defendant by the LGTCA deadline and the charge provides "the identity of the claimant, the time and place of the event, the nature of the claim, and the Plaintiff's intent to pursue litigation." *Nelson v. City of Crisfield*, L-10-1816, 2010 WL 4455923, at *2 (D. Md. Nov. 5, 2010).

Plaintiff did not plead compliance with the LGTCA notice provision in her Complaint. And, she does not make an argument to the contrary.  *See* ECF 11-1.  On this ground, under applicable Maryland law, the FEPA claim is also subject to dismissal.  However, this dismissal is likewise without prejudice, as plaintiff may plead compliance in an Amended Complaint.

Defendant contends that it has sovereign immunity as to plaintiff's FEPA claim, because Maryland has not waived its Eleventh Amendment immunity as to FEPA claims. ECF 10-1 at 17-18.  Plaintiff's briefing regarding sovereign immunity is woefully inadequate.  The Opposition merely asserts that, as a general matter, FEPA claims may be brought against public employers, without engaging with defendant's arguments. *See* ECF 11-1 at 10-11.

Because plaintiff's FEPA claim should plainly be dismissed for the same reasons as her Title VII claims, it is unnecessary to reach this complicated question.  If plaintiff files an Amended

Complaint, and continues to assert a FEPA claim, defendant may of course renew its sovereign immunity argument.[11]

In sum, I shall grant the Motion as to Count VI, but grant leave for plaintiff to file an Amended Complaint as to her FEPA claim.

### IV. Conclusion

For the reasons stated above, I shall grant the Motion and dismiss the Complaint. Dismissal is with prejudice at to Count III (hostile work environment), but without prejudice as to the remaining counts.

I shall grant leave to plaintiff to file an Amended Complaint as to Counts I, II, IV, V, and VI, due within 21 days of the date of docketing of this Memorandum Opinion and the accompanying Order. If plaintiff does not file an Amended Complaint within 21 days of the date of docketing of this Memorandum Opinion and the accompanying Order, I shall direct the Clerk to close the case.

---

[11] Without engaging in an extended discussion of sovereign immunity doctrine, I pause to note an issue that defendant failed to address. FEPA generally provides: "The State, its officers, and its units may not raise sovereign immunity as a defense against an award in an employment discrimination case under [FEPA]." S.G. § 20-903. Defendant's contention is premised on the Fourth Circuit's 2019 ruling in *Pense v. Maryland Department of Public Safety and Correctional Services*, 926 F.3d 97 (4th Cir. 2019). In *Pense*, the Fourth Circuit concluded that because S.G. § 20-903 "does not 'specify the State's intention to subject itself to suit in *federal court*,' [this] provision cannot be read to waive the State's Eleventh Amendment immunity." *Id.* at 102 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985)) (emphasis in *Pense*). Asserting that the BPD "is considered an arm of the State for the purpose of State law claims," defendant argues that, under *Pense*, the BPD enjoys immunity from FEPA claims in federal court. ECF 10-1 at 17-18.

But, *Pense* determined that Maryland had not waived its Eleventh Amendment immunity for FEPA claims, and concerned a state agency that the parties agreed enjoyed Eleventh Amendment immunity as a general matter. *See* 926 F.3d at 100-02. However, as discussed above, although the BPD is a state agency under state law, it is *not* considered a state agency for Eleventh Amendment purposes. Thus, at first glance, the holding in *Pense* would appear to be of minimal relevance to this case. And, looking purely at state law for the purpose of a state law claim, S.G. § 20-903 would seem to have waived sovereign immunity.

An Order follows, consistent with this Memorandum Opinion.


Date:  May 6, 2022                                    _____/s/_____
                                                     Ellen L. Hollander
                                                     United States District Judge