IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TASHAWNA GAINES,

    *Plaintiff*,

v.

    Civil Action No. ELH-21-1211

BALTIMORE POLICE
DEPARTMENT,

    *Defendant*.

## MEMORANDUM OPINION

In this employment discrimination case, plaintiff Tashawna Gaines has sued her former

employer, the Baltimore Police Department (the "BPD").  In an Amended Complaint (ECF 16),

Gaines alleges discrimination in violation of three statutes: Title VII of the Civil Rights Act of

1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII"); the Civil Rights Act of 1866, as

amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981; and the Maryland Fair Employment

Practices Act ("FEPA"), Md. Code (2021 Repl. Vol.), § 20-601 *et seq*. of the State Government

Article ("S.G.").[1]  In particular, the Amended Complaint contains five counts: discrimination on

the basis of race, in violation of Title VII (Count I); discrimination on the basis of sex, in violation

of Title VII (Count II); retaliation, in violation of Title VII (Count III); discrimination on the basis

---

[1] The defense moved to dismiss the initial Complaint.  ECF 10.  By Memorandum Opinion (ECF 14) and Order (ECF 15) of May 9, 2022, I granted the Motion, with leave to amend certain counts.  The Amended Complaint followed.  ECF 16.

As I noted earlier, (ECF 14 at 1 n.1) the caption of the Complaint referred to the defendant as "Baltimore City, Maryland; Baltimore Police Department."  ECF 16 at 1.  This could imply that plaintiff sued both the BPD and Baltimore City.  Curiously, although I pointed out the confusion, plaintiff did not revise the caption in the Amended Complaint.  In any event, the text of the Amended Complaint again refers to the "defendant" in the singular, and elsewhere it again seems to indicate that the BPD is intended as the sole defendant.  *Id*. ¶¶ 15-18.

of race, in violation of 42 U.S.C. § 1981 (Count IV); and discrimination on the basis of race and sex, in violation of FEPA (Count V).  ECF 16

Defendant has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  ECF 19.[2]  The motion is supported by a memorandum.  ECF 19-1 (collectively, the "Motion").  Plaintiff opposes the Motion (ECF 20), supported by a memorandum (ECF 20-1) (collectively, the "Opposition") and several exhibits.  ECF 20-3 to ECF 20-9.  Defendant has replied.  ECF 21 (the "Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion.

## I. Factual and Procedural Background[3]

Plaintiff, an "African American female" (ECF 16, ¶ 14), was an employee of the BPD for sixteen years.  *Id.* ¶¶ 17-19.  She attained the rank of Sergeant in 2011, and voluntarily left the BPD in 2015.  *Id.* ¶ 19.

On or about November 25, 2016, Gaines wrote a letter to Major James Handley at the BPD, in which "she requested rehire" with the BPD.  *Id.* ¶ 20.  Gaines explained that she had left the BPD to pursue a career interest in news media and had been working as a journalist at a local news television station in Salisbury, Maryland.  *Id.*  She did not provide the reason for which she sought to return to the BPD.

---

[2] Defendant also cites Rule 56, despite characterizing the motion only as one to dismiss.

[3] As discussed, *infra*, at this juncture I must assume the truth of the facts alleged in the suit. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).  Where appropriate, I have drawn on the factual background set forth in my Memorandum Opinion of May 9, 2022.  ECF 14.

Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not always correspond to the page number imprinted on the particular submission.

Plaintiff was told by then BPD Commissioner Kevin Davis, a Caucasian male, that she would not be reinstated to the rank of sergeant.  ECF 16, ¶ 21.[4]  Yet, plaintiff claims that several other officers who had left the BPD had been allowed to return to the BPD at their prior rank.  *Id.* These individuals include Keith Gladstone, Cutis Dixon, Juan Oliver, and Dameon Carter, three of whom are Black.  *Id.*  Plaintiff asserts that the only difference between these individuals and herself is her status as an African American woman.  *Id.* ¶ 22.  Further, Gaines alleges that there was no policy before, during, or after her tenure that would have resulted in her inability to return at her prior rank.  *Id.*

Plaintiff opted to return to work for the BPD.  *Id.* ¶ 23.  Although plaintiff does not state the actual date when she returned to work at the BPD, the BPD's "Position Statement" of November 19, 2018, states that plaintiff "began her employment with the BPD on March 13, 2017 as a Police Officer."  ECF 10-5 at 1.

Gaines claims that, due to her demoted rank, she "began to seek secondary employment." ECF 16, ¶ 23.  On September 18, 2017, approximately six months after rejoining the BPD, plaintiff "sought "secondary employment outside of the BPD at WBAL News Radio as a news anchor/reporter, scheduled for Saturdays and Sundays from 6 a.m. to 2 p.m."  *Id.* ¶ 24; *see* ECF 10-4.  Gaines claims that the BPD had been "well aware" of her "involvement in news broadcasting and journalism as she had previously mentioned it in her letter to Major James Handley upon her rehiring."  ECF 16, ¶ 24.

---

[4] Davis is no longer the BPD Commissioner.

The Amended Complaint sometimes refers to plaintiff as "Sgt. Gaines." *See, e.g.*, ECF 16, ¶¶ 8, 17, 19, 24, 29, 30, 45.  But, the narrative makes clear that plaintiff was not rehired as a Sergeant. *See id.* ¶ 23.  Furthermore, on plaintiff's Request for Secondary Employment form, dated September 18, 2018, she gave her title as "Ofc.," not "Sgt." *See* ECF 10-4.

Plaintiff's request for secondary employment was promptly approved by Lieutenant Donald Gerkin, Shift Commander, as well as Major Rich Gibson, the District Commander, on our about September 18 and 19, 2017, respectively. *Id.* ¶ 25; *see* ECF 10-4. Gaines asserts that both "possessed the authority to grant approval of the secondary employment." ECF 16, ¶ 25. Gaines began her secondary employment on September 28, 2017. *Id*. ¶ 26. However, as discussed, *infra*, plaintiff claims that Commissioner Davis subsequently denied the request for secondary employment. *Id*. ¶ 27. But, after Gaines complained, the secondary employment was again approved. *Id*. ¶ 36.

With the BPD's earlier motion to dismiss, it submitted a copy of plaintiff's "Request for Secondary Employment Form." ECF 10-4. On the form, plaintiff indicated that she was seeking employment as a "Radio News Anchor/Reporter." *Id*.[5] She signed the form on September 18, 2017. *Id*. She also provided her "Reason for Desiring Secondary Employment," stating: "Career enhancement and career development in radio communications." *Id.* Below plaintiff's signature is a "Reviewed By" box, with space for a signature and "Recommendation" from each reviewer. *Id*. The "Reviewed By" box contains two signatures. *Id*. One appears to be that of a sergeant, and one appears to be that of a lieutenant, but the handwriting is not clear enough to identify the name of either individual. *Id*. Next to each signature, in boxes located under the word "Recommendation," each reviewer wrote "Approved." *Id*. One signature is dated September 18, 2017, and the other is dated September 19, 2017. *Id*.

Under the "Reviewed By" box is another box, labelled "Comments About Recommendation." *Id*. The word "Approved" is written in this box. *Id*. Below this box is a

---

[5] As discussed, *infra*, plaintiff has not challenged the authenticity of ECF 10-4, or the Court's consideration of it.

section that contains space for the name and signature of the "Commanding Officer," as well as a date.  *Id.*  A name and signature appear in this space, with a date of September 18, 2017.  *Id.*  However, the handwriting is not clear enough to determine the name of the individual.  Below this area is a space marked "Action of the Overtime Unit Commanding Officer," with a space for a signature and the date.  *Id.*  The word "Approved" appears above "Action of the Overtime Unit Commanding Officer," with another unclear signature, and a date of October 2, 2017.  *Id.*[6]

Plaintiff alleges that "Commissioner Davis denied the secondary employment approval claiming that the approval was null and void without his signature." ECF 16, ¶ 27.  Further, Gaines contends that the "rescinding of Plaintiff's secondary employment approval was further discrimination based on Plaintiff's race and sex as there was no reason as to why Commissioner Davis was denying Plaintiff's approval against BPD practice when secondary employment for non-black and/or male employees only needed approval at the shift commander level." *Id.* ¶ 28.

According to Gaines, the BPD claimed that plaintiff had submitted the wrong form, and that the correct form would have required Davis's approval.  *Id.* ¶ 29.  However, plaintiff alleges that, at the time she submitted her request in September 2017, the form she completed was the only one that was available; the form the BPD labels as the correct one was not created until March 2018.  *Id.*  In addition, when plaintiff completed her request form in September 2017, she "was not informed that there were issues with the form she submitted prior to the initial approval signed by *two* of her superiors." *Id.* (emphasis in original).  And, plaintiff asserts that there "was no reason why Commissioner Davis' signature was needed contrary to practiced policy at the time other than to discriminate against Plaintiff for her race and sex." *Id.* ¶ 32.

---

[6] The signature is followed either by initials or the abbreviation "Sgt".  ECF 10-4.

Further, Gaines claims that she was not informed "that the secondary employment she sought did not meet the requirements under the provisions of the BPD." ECF 16, ¶ 30. But, plaintiff claims that the BPD then said "that her employment as a journalist would result in an inevitable conflict of interest that BPD could not approve of due to her work as a police officer which made her privy to internal details." *Id.*[7]

The Amended Complaint references "Police Officer Sergeant Zimmerman (Caucasian male)," who sought and obtained approval for secondary employment from his shift commander, without needing to receive approval from Davis. *Id.* ¶ 31.[8] Zimmerman allegedly sought secondary employment as a lawyer, which plaintiff states "would undoubtedly have caused a conflict of interest equal to, if not more, than Plaintiff's requested employment as a journalist." *Id.* Yet, according to plaintiff, Zimmerman was approved for secondary employment providing legal work without the need for approval from Commissioner Davis. *Id.*

According to the Amended Complaint, "instead of allowing Plaintiff to rectify any administrative issues, Commissioner Davis threatened Plaintiff by telling her that Plaintiff could either terminate her secondary employment or resign from the BPD or be charged with insubordination and failure to obey command." *Id.* ¶ 33. In addition, Davis "advised" Gibson, Gerkin, and a third BPD officer, Sergeant Tanesha Todd, to inform plaintiff that she "was not allowed to work at her secondary employment or be subjected to the above-mentioned disciplinary actions." *Id.* ¶ 34.

Plaintiff requested an explanation as to why "similarly situated Caucasian male workers" could obtain secondary employment after receiving approval from their shift commanders,

---

[7] Plaintiff does not identify the person who allegedly made the remark.

[8] According to the Amended Complaint, upon information and belief, Zimmerman has passed away. ECF 16 at 8 n.1.

whereas she was "mandated" either to terminate her secondary employment, resign from the BPD, or be charged with insubordination and failure to obey command.  ECF 16, ¶ 35.  After plaintiff raised this issue, the "BPD approved the secondary employment request again on October 2, 2017."  *Id*. ¶ 36.  Specifically, this approval refers to the "Action of the Overtime Unit Commanding Officer" signature on the "Request for Secondary Employment Form."  *See* ECF 10-4.  As noted, the handwriting is not clear enough to determine the name of the person at the BPD who approved the request on October 2, 2017.

According to the Amended Complaint, although the BPD ultimately approved plaintiff's secondary employment request, "Commissioner Davis proceeded to reject Plaintiff's work schedule in an effort to force her to be unable to work as an officer and at her secondary employment in retaliation for her pushback against the disapproval."  ECF 16, ¶ 37.  Gaines alleges that Commissioner Davis once again "began to threaten Plaintiff by telling her that Plaintiff could either terminate her secondary employment or resign from the BPD or be charged with insubordination and failure to obey command."  *Id*. ¶ 39.  As a result, plaintiff asserts that she was forced to retire from the BPD on October 28, 2017.  *Id*. ¶ 40.

On November 6, 2017, following plaintiff's resignation, she filed a Charge with the Equal Employment Opportunity Commission ("EEOC").  *Id*. ¶ 7; *see* ECF 10-3.  The Charge recounted the circumstances of plaintiff's secondary employment request and resignation, as alleged above, and asserted discrimination on the basis of race and sex, as well as retaliation.  ECF 10-3 at 1-2.  In the Charge, plaintiff stated that the discrimination occurred between September 28, 2017, and October 26, 2017.  She did not check the box marked "Continuing Action."  *Id*. at 1.  Nor did she complain about not being rehired as a Sergeant.

However, plaintiff filed an amended charge with the EEOC on May 25, 2018, in which she added that she had "since learned" of male individuals who were rehired at the rank of Sergeant, an option that was allegedly denied to plaintiff.  ECF 10-6 (the "Amended Charge") at 1-2.  The Amended Charge retained the same bases for discrimination, as well as the same dates, *i.e.*, September 28, 2017, to October 26, 2017.  *Id.* at 1.

The EEOC issued a "Determination" as to plaintiff's Amended Charge on April 26, 2019. ECF 20-5 at 2-3 (the "Determination").  The Determination stated that the BPD had not responded to the EEOC's request for a response regarding plaintiff's rehiring allegations.  *Id.* at 2.  However, it appears that the BPD did submit a "Position Statement" on November 19, 2018, in response to plaintiff's "charge of race and sex discrimination and retaliation filed against the BPD."  *See* ECF 10-5 at 1.  In any event, because the EEOC believed BPD had not responded, the EEOC "inferred that examination of [the BPD's] evidence would not refute [Gaines's] allegation."  *Id.* Accordingly, the EEOC found that "the evidence provided by [Gaines] establishes reasonable cause to believe that [the BPD] violated Title VII when it denied her rehire at her prior rank."  ECF 20-5 at 2.  But, with regard to plaintiff's other allegations, the EEOC "made no finding."  *Id.*

The Determination explained that the EEOC would attempt to eliminate the alleged practice by conciliation.  *Id.* at 2-3.  However, in a letter to plaintiff dated June 25, 2019, the Director of the Baltimore Field Office of the EEOC informed plaintiff that the EEOC's efforts to conciliate her Charge "have been unsuccessful."  *Id.* at 1; *see also* ECF 16, ¶ 8.  The letter also informed plaintiff that the "case has been referred" to the Justice Department to determine if a civil action should be brought.  ECF 20-5 at 1; ECF 16, ¶ 8.

Approximately two years later, plaintiff, through counsel, requested a right-to-sue letter from the EEOC. ECF 16, ¶ 8. The right-to-sue letter was issued on April 16, 2021. *Id*. ¶ 9. This litigation followed.

Plaintiff filed her initial Complaint on May 17, 2021. ECF 1. It contained the same five counts that are set forth in the Amended Complaint, as well as a hostile work environment claim. *Id*. On October 8, 2021, defendant moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment prior to discovery. ECF 10. And, the BPD submitted several exhibits with the prior motion. By Memorandum Opinion (ECF 14) and Order (ECF 15) of May 9, 2022, I construed the motion as one to dismiss and granted the motion. In particular, I dismissed plaintiff's hostile work environment claim with prejudice, and dismissed the remaining five counts, without prejudice and with leave to amend.

The Amended Complaint followed. ECF 16. Gaines reiterates that she was discriminated against on the basis of her race and sex, in violation of Title VII. Specifically, she alleges race and sex discrimination because "she was denied reinstatement to her rank of Sergeant upon her rehire contrary to practice with white and/or male employees . . . ." *Id*. ¶ 47. Further, she alleges discrimination based on race and sex because "she was forced to resign, while similarly situated Caucasian male employees such as Officer Zimmerman were allowed to obtain secondary employment approval through their Shift Commander, without the need for Commissioner approval." *Id*.

Gaines also asserts that she was subjected to retaliation after she reported the discrimination to the BPD regarding Commissioner Davis's disapproval. *Id*. ¶ 90. She alleges that "the adverse employment action regarding Plaintiff's secondary employment was the denial of her work schedule in an effort to retaliate against her for her pushback against Commissioner Davis'

disapproval." ECF 16, ¶ 90. And, according to the Amended Complaint, "[a]fter Plaintiff's statutorily protected activity, she was subjected to retaliation, including but not limited to, where Plaintiff was forced to resign . . . ." *Id.*

In addition, plaintiff alleges that, because of her race, sex, and engagement in protected activity, she was "subjected to the unlawful conduct and adverse actions alleged throughout this Complaint," in violation of 42 U.S.C. § 1981. *Id.* ¶¶ 112-133. As for the claim under the Maryland Fair Employment Practices Act, Gaines contends that she was "subjected to harassment or offensive conduct that is based on race and sex, where Plaintiff was denied reinstatement to her rank of Sergeant upon her rehire contrary to practice with white and/or male employees and when she was forced to resign . . . ." *Id.* ¶ 138.

Further, Gaines attempts to connect her allegations as to discrimination on the basis of race and sex to larger institutional problems at the BPD. She asserts that "the complicit institutional engine that acquiesces in the destruction and demise of BPD's own Black women officers and sergeants remains pervasive, continuous, and swept under the rug." *Id.* ¶ 1.

Additional facts are included in the Discussion, *infra.*

## II.  Standards of Review

### A.  Rule 12(b)(1)

Defendant filed the Motion pursuant to Fed R. Civ P. 12(b)(6). ECF 19. The BPD contends, *inter alia*, that Count V of the Complaint must be dismissed because defendant enjoys sovereign immunity in federal court as to the FEPA claim. *See* ECF 19-1 at 26-27.

"Sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction." *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir.

2018) (internal citation omitted), *cert. denied*, 139 U.S. 417 (2018); *see also, e.g.*, *Phillips v. Md. Bd. of Law Examiners*, ADC-19-2427, 2021 WL 633378, at *4 (D. Md. Feb. 18, 2021); *Davis v. Pavlik*, GLH-20-547, 2020 WL 7489011, at *2 (D. Md. Dec. 21, 2020).   Generally, such an argument is addressed under Rule 12(b)(1), rather than Rule 12(b)(6).   But, the Motion does not invoke Rule 12(b)(1)

Under Rule 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of evidence, the existence of subject matter jurisdiction.  *See Demetres v. E. W. Const., Inc*., 776 F.3d 271, 272 (4th Cir. 2015); *see also The Piney Run Preservation Ass'n v. Cty. Comm'rs of Carroll Cty*., 523 F.3d 453, 459 (4th Cir. 2008); *Evans v. B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999).  However, a court should grant a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) "'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'"  *B.F. Perkins*, 166 F.3d at 647 (citation omitted).

A challenge to subject matter jurisdiction under Rule 12(b)(1) may proceed "in one of two ways": either a facial challenge or a factual challenge.  *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009); *accord Hutton v. Nat'l Bd. of Exam'rs Inc*., 892 F.3d 613, 620-21 (4th Cir. 2018). Here, defendant raises a facial challenge to the Court's subject matter jurisdiction as to Count V, asserting that the doctrine of sovereign immunity forecloses plaintiff's claim.   In such a case, "the defendant must show that a complaint fails to allege facts upon which subject-matter jurisdiction can be predicated."  *Hutton*, 892 F.3d at 621 n.7; *see Kerns*, 585 F.3d at 192 (noting that in a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction").

### B.  Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  *Nadendla v. WakeMed*, 24 F.4th 299, 304-05 (4th Cir. 2022); *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Nadendla*, 24 F.4th at 304-05; *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect

12

statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether

those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

As to Title VII, at the motion to dismiss stage, the question "is whether [the plaintiff] alleges facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 617 (4th Cir. 2020) (citation omitted).  Although the plaintiff must state a plausible claim for relief, *Twombly*, 550 U.S. at 570, a plaintiff need not establish a prima facie case of discrimination. *Swierkiewicz v. Sorema*, 534 U.S. 506 (2002).

The BPD argues at length that, as to Counts I and II, plaintiff has failed to establish a prima facie case of discrimination under Title VII. *See* ECF 19-1 at 7-9.  Yet, as noted, the Supreme Court explained that the "prima facie case under *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)] . . . is an evidentiary standard, not a pleading requirement." *Swierkiewicz,* 534 U.S. at 510.  Further, the Court stated that it has "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511.  Therefore, "an employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also Laurent-Workman v. Wormuth*, 54 F.4th 201, 210 (4th Cir. 2022); *Bing*, 959 F.3d at 616; *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, 557 U.S. 1138 (2016).

However, as the Second Circuit has observed, the Supreme Court's holding in *Swierkiewicz* is arguably in tension with the Court's subsequent rulings in *Iqbal*, 556 U.S. 662, and *Twombly*, 550 U.S. 544. *See Littlejohn v. Cty. of New York*, 795 F.3d 297, 307 (2d Cir. 2015). On the one hand, "[r]eading *Swierkiewicz* on its face, it appears to have meant that

a Title VII plaintiff is not required to plead facts supporting even a minimal inference of discriminatory intent." *Id.* at 309. On the other hand, in *Twombly* the Court said that a plaintiff must "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. And, in *Iqbal*, the Court clarified that the heightened pleading standard of Twombly is applicable in "'all civil actions' . . . ." *Iqbal*, 556 U.S. at 684.

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies[.]" *See Swaso v. Onslow Cty. Bd. of Educ.*, 698 Fed. App'x 745, 747-48 (4th Cir. 2017) ("While a plaintiff need not plead a prima facie case to survive a motion to dismiss, a Title VII complaint is still subject to dismissal if it does not meet the ordinary pleadings standard under *Twombly* and *Iqbal*." (internal citations omitted)); *see also Holloway v. Maryland*, 32 F.4th 293, 298 (4th Cir. 2022); *McCleary*, 780 F.3d at 584; *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012).

In connection with a Rule 12(b)(6) motion, courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary

to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'"  *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

Notably, a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of an opposition to a motion.  *See, e.g.*, *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy."); *Glenn v. Wells Fargo Bank, N.A.*, DKC-3058, 2016 WL 3570274 at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not alleged in the suit); *Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n. 4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991) ("'[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss'") (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir.1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).  *See Goines*, 822 F.3d at 166 (a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits."); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ.*

*Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).   In contrast, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]"   *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 576 U.S. 155, 135 S. Ct. 2218 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

And, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it."   *Goines*, 822 F.3d at 167.   Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper."   *Id.*   Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true."   *Id.*

Moreover, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment.   *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015).   In particular, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity."   *Goines,* 822 F.3d at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017);

17

*Kensington Volunteer Fire Dep't v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)) (emphasis in original) (citation omitted); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

"In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions."  *Campbell v. Mayorkas*, 3:20-cv-697-MOC, 2021 WL 2210895, at *1 n.3 (W.D.N.C. July 1, 2021) (citing *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018)).  In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As mentioned, defendant submitted exhibits with its prior motion to dismiss or for summary judgment.  ECF 10.  But, the BPD did not resubmit them with the pending Motion or explicitly incorporate them.  Nevertheless, defendant refers to the documents that it previously submitted, and seems to assume that the Court may consider them.  *See* ECF 19-1 at 3-4.

18

Although defendant failed to incorporate its earlier submissions, plaintiff does not take issue with consideration of the exhibits. Therefore, based on the principles outlined above, I may consider the following documents submitted with defendant's initial motion (ECF 10); they are referenced in or otherwise integral to the Amended Complaint and their authenticity is not disputed: plaintiff's Charge (ECF 10-3); plaintiff's secondary employment request form (ECF 10-4); and plaintiff's Amended Charge (ECF 10-6).[9] Likewise, I may consider the EEOC's Determination, submitted with the Opposition. ECF 20-5. And, I may consider ECF 20-3 and ECF 20-4, which are BPD policy documents relating to secondary employment, because they are public documents.

However, as I said in my Memorandum Opinion of May 9, 2022 (ECF 14), I may not consider the content of ECF 10-5, which is defendant's Position Statement regarding plaintiff's Charge, submitted by the BPD to the EEOC on November 19, 2018, with supporting documents. This document is neither referenced in nor integral to the Amended Complaint. Instead, I will consider the document only for the limited purpose of noting that defendant responded to plaintiff's Charge.

### III. Discussion

### A. Count I and Count II (Race and Sex Discrimination)

#### 1.

In Count I and Count II, plaintiff lodges claims of race and sex discrimination, respectively, claiming that she "suffered an adverse employment action" when she was "denied reinstatement to her rank of Sergeant upon her rehire contrary to practice with white and/or male employees and

---

[9] Similarly, I considered these documents in my Memorandum Opinion of May 9, 2022. ECF 14 at 20.

when she was forced to resign, while similarly situated Caucasian male employees . . . were allowed to obtain secondary employment . . . .", without need for Commissioner approval.  ECF 16, ¶ 47; *see also* ¶ 69.

Defendant argues that plaintiff has failed to allege a prima facie case of Title VII discrimination.  ECF 19-1 at 7-17.[10]  In particular, as to both Count I and Count II, defendant argues that plaintiff did not suffer an adverse employment action, nor has she identified an adequate comparator.  *Id.* at 9-17.

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2; *see Wormuth*, 54 F.4th at 210; *Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 117 (4th Cir. 2021).  This proscription is "often referred to as the 'disparate treatment' (or 'intentional discrimination') provision . . . ."  *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015).  The Supreme Court has referred to discrimination based on one of the five characteristics specified above as "status-based discrimination."  *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013).  Moreover, "terms, conditions or privileges of employment" is "an expansive concept."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).

Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding.  42 U.S.C. § 2000e-3. *See Wormuth*, 54 F.4th at 212. In 42 U.S.C. § 2000e-3, it states: "It shall be an unlawful

---

[10] As noted earlier, at this juncture, the law does not require plaintiff to establish a prima facie case.

employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *See*, *e.g.*, *Sempowich v. Tactile Systems Technology, Inc.*, 19 F.4th 643, 654 (4th Cir. 2021); *Roberts*, 998 F.3d at 122; *Kitlinski v. United States Dep't of Justice*, 994 F.3d 224, 232 (4th Cir. 2021); *Evans v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F.3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

Although a plaintiff need not assert a prima facie claim of discrimination under Title VII in order to survive a Rule 12(b)(6) motion, reference to the elements of a Title VII claim is helpful to gauge the sufficiency of the allegations. A plaintiff generally must allege "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc.*, *Inc.*, 807 F.3d 619, 626 (4th Cir. 2015) (quoting *Coleman*, 626 F.3d at 190); *see Sempowich*, 19 F.4th at 649-50; *Matias v. Elon Univ.*, 780 Fed. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 Fed. App'x 198, 203 (4th Cir. 2018).

Plaintiff readily meets the first element. With respect to the satisfactory job performance factor, a plaintiff need not "show that he was a perfect or model employee. Rather, a plaintiff must only show that he was qualified for the job and that he was meeting his employer's legitimate

expectations." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019); *see Sempowich*, 19 F.4th at 650.

As noted, plaintiff contends that she suffered an adverse employment action when she was not rehired at the same rank that she held when she left the BPD the first time, and when "she was forced to resign" over the issue of secondary employment. ECF 16, ¶ 69. "[T]he existence of some adverse employment action is required" for a plaintiff to prevail with respect to a Title VII discrimination claim. *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).

An "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); *see also Laird v. Fairfax Cty, Va.*, 978 F.3d 887, 893 (4th Cir. 2020) ("For a discrimination claim, the plaintiff must show that her employer took an action that adversely 'affect[ed] employment or alter[ed] the conditions of the workplace.'" (quoting *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) ("*Burlington Northern*"))). And, the adverse action must have "occurred under circumstances that raise a reasonable inference of unlawful discrimination . . . ." *Sempowich*, 19 F.4th at 650 (citing *Bing*, 959 F.3d at 616 n.8; *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007)); *see also Swaso*, 698 Fed. App'x at 747-48 (requiring that "the adverse employment action occurred 'under circumstances giving rise to an inference of unlawful discrimination.'") (quoting *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011)).

With respect to the fourth element, *i.e.*, disparate treatment, "[w]here a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful

discrimination," the plaintiff must demonstrate that the comparator is similarly situated in all relevant respects. *Swaso*, 698 Fed. App'x at 748; *see Irani v. Palmetto Health*, 767 Fed. App'x 399, 420 (4th Cir. 2019) (per curiam); *Haywood v. Locke*, 387 Fed. App'x 355, 359 (4th Cir. 2010); *Coleman*, 626 F.3d at 191; *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008). The "fourth element is met if 'similarly-situated employees outside the protected class received more favorable treatment.'" *Swaso*, 698 Fed. App'x at 747 (quoting *White v. BFI Waste Services*, 375 F.3d 288, 295 (4th Cir. 2004)).

Of import, "[i]f a plaintiff wishes to prove that a defendant's legitimate, non-discriminatory explanation is pretext by pointing to other employees who were treated differently, '[t]he similarity between comparators . . . must be clearly established in order to be meaningful.'" *Swaso*, 698 Fed. App'x at 748 (citation omitted). This includes "that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood*, 387 Fed. App'x at 359 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Put another way, "the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination.'" *Swaso*, 698 Fed. App'x at 748 (quoting *Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011)).

But, the Fourth Circuit has cautioned that "'[t]he similarly situated analysis typically occurs in the context of establishing a *prima facie* case of discrimination, not at the 12(b)(6) stage.'" *Holloway*, 2022 WL 1207165, at *3 (quoting *Woods*, 855 F.3d at 651) (alteration in *Holloway*). Nevertheless, at the motion to dismiss stage, the plaintiff should still "identify the proposed

comparator and 'establish a plausible basis for believing [the employee was] actually similarly situated.'" *Asi v. Info. Mgmt. Group, Inc.*, GLR-18-3161, 2019 WL 4392537, at *6 (D. Md. Sept. 13, 2019) (internal citation omitted) (alteration in *Asi*).

Plaintiff relies on putative comparators to assert her claim. But, the comparator methodology is not the only vehicle to establish a claim. In *Swaso*, a racial discrimination case, the Court said, 698 Fed. App'x at 748: "A plaintiff is not required to identify a similarly situated white comparator to prove her discrimination claim, so long as she can establish an inference of unlawful discrimination through other means." *See also Haywood*, 387 Fed. App'x at 359 ("Plaintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim."); *Bryant v. Aiken Regional Medical Ctrs.*, 333 F.3d 536, 545 (4th Cir. 2003) (same); *Bowen v. Md. Dep't of Pub. Safety and Correctional Servs.*, RDB-17-1571, 2018 WL 1784463, at *10 (D. Md. Apr. 12, 2018).

## 2.

As noted, plaintiff alleges that, despite her rehire by the BPD, she was unlawfully denied reinstatement at the rank of Sergeant. She identifies Keith Gladstone (White male); Curtis Dixon (Black male); Juan Oliver (Black male); and Dameon Carter (Black male) as officers who "had been allowed to return to BPD after leaving and retain their prior rank." ECF 16, ¶ 21. According to plaintiff, all of the individuals were Sergeants for varying lengths of time before leaving the BPD. For instance, Gladstone and Oliver had each been a Sergeant for a shorter length of time than plaintiff before leaving the BPD, while Dixon and Carter held the rank for approximately three years longer than plaintiff. *Id.* And, according to plaintiff, all four individuals were reinstated as Sergeants within approximately three years of plaintiff's return to BPD. *Id.*

24

BPD contends that the "named comparators are not, in fact, comparators at all." ECF 19-1 at 10. In particular, BPD explains that plaintiff "does not state who the Police Commissioner was at the time of hire, nor does she explain the assignments into which these officers were hired. She does not explain their level of experience, background, or supervisors. She does not explain who hired them, how they were hired, or why they were hired." *Id*. at 9 (citations omitted).

As to the adequacy of a comparator, *Coleman*, 626 F.3d 187, is relevant. The plaintiff in *Coleman* brought a Title VII suit against his former employer, which had terminated him. *Id*. at 189. The plaintiff's termination had been justified, in part, by allegations that the plaintiff had steered contracts to vendors with which he had an interest, a charge the plaintiff labeled as false. *Id*. The plaintiff alleged that he had actually been terminated because he is African American, and because he had requested sick leave. *Id*. The plaintiff identified a named, white employee as similarly situated, because he also had "outside business involvements" but was not disciplined. *Id*. at 190-91. The district court dismissed the Title VII claim for failure to state a claim, and the Fourth Circuit affirmed. *Id*. at 190. The Fourth Circuit concluded that the comparator allegations were conclusory. In its view, the plaintiff did not "establish a plausible basis for believing [the white employee] and Coleman were actually similarly situated or that race was the true basis for Coleman's termination." *Id*. at 191.

Here, all four individuals allegedly had similar experience as Sergeants, and were reinstated as Sergeants within a similar time frame. In my view, there is a plausible basis to find that at least one such individual is a valid comparator. But, that does not end the inquiry.

**3.**

Even if the comparator allegations are sufficient at the Rule 12(b)(6) stage, *see Holloway*, 2022 WL 1207165, at *3, plaintiff's rehiring claim fails as to the requirement for an adverse

employment action.  As noted, an "adverse employment action" is one that "'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Hoyle*, 650 F.3d at 337 (quoting *Ellerth*, 524 U.S. at 761).

The typical requirements for a showing of an adverse employment action include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir.1999).  Plaintiff argues that "she was effectively demoted" when she was rehired, ECF 20-1 at 3, and that "[t]his demotion of Plaintiff clearly resulted in a removal of her duties, and a change of the scope of her work, work hours, and work responsibilities, which is well within the bounds of an adverse employment action."  *Id*. at 5.

Plaintiff voluntarily left the BPD to pursue other career interests.  She does not point to any authority that suggests that an adverse employment action occurs when an employer rehires a former employee, but for a different position or at a lower rank.  The Court rejects plaintiff's characterization that she was "effectively demoted" by the BPD when it rehired her at a different rank.

Although plaintiff's claim concerns a failure of BPD to rehire her at the same rank she previously held, I will analogize the claim to an initial failure-to-hire, as the analogy seems apt.

To establish a prima facie case for discriminatory failure to hire, a plaintiff must show that: (1) she belonged to a protected class; (2) she applied for, and was qualified for, a job for which the employer was seeking applicants; (3) she was rejected despite her qualifications; and (4) after her rejection, the position remained open and the employer continued to seek similarly-qualified

applicants, or filled the position with an applicant outside the protected class. *McDonnell Douglas*, 411 U.S. at 802; *E.E.O.C. v. Sears Roebuck & Co*., 243 F.3d 846, 851 (4th Cir. 2001).

Certainty, plaintiff belongs to a protected class, ECF 16, ¶ 14, and she has alleged that she applied for, and was qualified for, a position as Sergeant. *Id*. ¶¶ 19, 20. However, she has not alleged that the BPD was seeking applicants at the rank of Sergeant. Additionally, plaintiff does not allege that after the BPD declined to offer her the rank of Sergeant, it sought other applicants for the position of Sergeant. Nor does she claim that the BPD filled the position for which she applied with an applicant outside the protected class.

Plaintiff must do more than simply point to her race and gender to adequately allege discrimination in hiring. She has not done so, and thus her claim on this point fails.

**4.**

Turning to plaintiff's secondary employment claim, Gaines identifies as a comparator "Police Officer Sergeant Zimmerman," a "Caucasian male" who "sought and was approved for secondary employment by his shift commander" without needing approval from Commissioner Davis. ECF 16, ¶ 31. Gaines asserts that Zimmerman was not "forced to resign," in contrast to plaintiff. *Id*. ¶ 47. Moreover, she alleges that Zimmerman sought secondary employment as a lawyer, which "would undoubtedly have caused a conflict of interest equal to, if not more, than Plaintiff's requested employment as a journalist." *Id*. ¶ 31.

The Amended Complaint does not allege that Zimmerman was "supervised by the same supervisor, subjected to the same performance standards, engaged in the same conduct, or maintained the same job duties and responsibilities" as plaintiff. *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 420 (D. Md. 2015). Moreover, the Amended Complaint makes clear that Zimmerman was a Sergeant, but plaintiff was not rehired as a Sergeant. ECF 16,

¶¶ 21, 23.  Yet, Zimmerman was a Sergeant.  Therefore, their work positions were not comparable. *See, e.g.*, *Young v. Montgomery Cty.*, CBD-18-2054, 2020 WL 5513438, at *6 (D. Md. Sept. 14, 2020) (noting that another police officer was an "invalid comparator[]" to plaintiff because, among other reasons, he was a Sergeant and plaintiff was a corporal).

In addition, plaintiff alleges that her secondary employment request was approved, but her subsequent work schedule request was rejected.  *See* ECF 16, ¶ 37.  But, there is no allegation that Zimmerman ever requested a modification to his work schedule, or that one was requested and then granted.  *See, e.g.*, *id*. ¶ 31.

The type of secondary employment also is not comparable.  As indicated, Zimmerman sought secondary employment as a lawyer.  Gaines seems to assume that if Zimmerman sought secondary employment as a lawyer, that job had the same potential for conflict of interest as that of a news person.  On this basis, she seems to assume that Zimmerman would have worked as a lawyer in the field of criminal law.  But, the Amended Complaint does not specify the legal practice area.  And, there are many practice areas in the law that do not require interaction with law enforcement.  In contrast, even if plaintiff were not personally assigned to cover crime stories while working as a news reporter, she would be working among colleagues covering such matters. The potential for her conflict of interest is obvious.

In sum, plaintiff has identified a comparator but has made only conclusory allegations as to similarity.  These allegations are simply not enough to "'eliminate confounding variables, such as differing roles, performance histories, or decision making personnel.'"  *Williams*, 86 F. Supp. 3d at 420 (citing and quoting *Humphries v. CBOCS W., Inc.,* 474 F.3d 387, 405 (7th Cir. 2007)).

Decisions from other judges in this District support this conclusion.  *See, e.g.*, *Stovall v. H&S Bakery*, TDC-20-3234, 2021 WL 2580746, at *5 (D. Md. June 23, 2021) (dismissing

complaint that did not allege whether employee comparators "held the same or similar positions as [the plaintiff], had the same supervisor as him, or were subject to the same standards," nor whether their alleged misconduct was similar); *Walker v. Md. Dep't of Info. and Tech.*, CCB-20-219, 2020 WL 6393435, at *4 (D. Md. Nov. 2, 2020) (dismissing complaint, and noting that the plaintiff "has . . . failed to adequately plead that she was similarly situated in all relevant aspects to her comparators"); *Bynum v. Martin*, GLH-16-2067, 2016 WL 7468050, at *5-6 (D. Md. Dec. 27, 2016) (dismissing complaint that "identifie[d] a number of potential comparators but each has different or mitigating circumstances distinguishing their situations from" plaintiff's); *Parker v. Ciena Corp.*, WDQ-14-4036, 2016 WL 153035, at *5 (D. Md. Jan. 12, 2016) (dismissing complaint with one named comparator but "no information from which to infer that [the comparator] was similarly situated," and noting that "[m]ultiple courts in this circuit have dismissed complaints that have failed to adequately establish the alleged comparators were similar").

**5.**

Gaines alleges that, following the approval of her request for secondary employment, defendant nevertheless "proceeded to reject Plaintiff's work schedule in an effort to force her to be unable to work as an officer." ECF 16, ¶ 37.  Further, she asserts that the BPD was not willing to accommodate her by modifying her work schedule, as she requested, so as to actually make the secondary employment feasible.  *Id.*

Even assuming that Zimmerman is a valid comparator, the parties have presented no case law that indicates that the denial of secondary employment constitutes an adverse employment action.

"An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc*., 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz–Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir.2004). "Although conduct short of ultimate employment decisions can constitute adverse employment action, there still must be a tangible effect on the terms and conditions of employment." *Geist v. Gill/Kardash P'ship*, 671 F.Supp.2d 729, 737 n. 6 (D. Md. 2009).

The Seventh Circuit has said, albeit in the retaliation context and without much discussion, that "refusal to allow [an employee] to pursue secondary employment" could be considered an adverse action. *Silk v. City of Chicago*, 194 F.3d 788, 800 (7th Cir. 1999).  In one case in this District, the plaintiff, a police officer, identified an alleged denial of a request for secondary employment as one of several adverse employment actions. *Cherry v. Bealefeld*, CCB-08-1228, 2010 WL 917421, at *3-4 (D. Md. Mar. 9, 2010).  But, the defendant did not contest that adverse employment actions had occurred, and Judge Blake granted summary judgment for the defendant on other grounds, without the need to determine whether the denial of secondary employment constituted an adverse action. *Id*. at *3-6.

Moreover, by plaintiff's own admission in her Amended Complaint, BPD ultimately *approved* her secondary employment request.  ECF 16, ¶ 37.  To be sure, plaintiff maintains that, unlike her colleagues, she was required to obtain the approval of the Police Commissioner, rather than lower-level officers. *Id*. ¶¶ 27-29, 31, 32, 47, 69.  But, it is difficult to see how this additional bureaucratic hurdle and the brief delay it occasioned, however unwelcome or unfair it might have seemed to plaintiff, could constitute a "'significant change in employment status.'" *Hoyle*, 650 F.3d at 337 (quoting *Ellerth*, 524 U.S. at 761); *see also Chang Lim v. Azar*, 310 F. Supp. 3d 588, 601 (D. Md. 2018) (finding that the denial of plaintiff's flexible work plan was not an adverse

action because it "did not affect his pay or benefits, downgrade his title, or reduce his job responsibilities.").

As noted, plaintiff also contends that she was later told that she would be charged with "insubordination and failure to obey command" if she did not resign from her secondary job.  ECF 16, ¶ 33.   But, threatened termination does not rise to the level of an adverse action in a discrimination claim.  *Harris v. Esper*, JKB-18-3562, 2019 WL 5423768, at *6 (D. Md. Oct. 23, 2019).

In general, the mere threat of discipline is not an adverse action unless it actually leads to alterations in the terms and conditions of employment.  *See, e.g.*, *Thorn v. Sebelius*, 766 F. Supp. 2d 585 at 603 (D. Md. 2011) (holding that retaliatory emails, a change in plaintiff's work schedule, unwarranted reprimands, and exclusion from a work project were not actionable adverse employment actions); *Jeffers v. Thompson*, 264 F. Supp. 2d 314, 330 (D. Md. 2003); *cf. Parsons v. Wynne*, 221 Fed. Appx. 197, 199 (4th Cir.2007) ("Neither [plaintiff's] . . . performance evaluation or her removal from the alternative work schedule would have dissuaded a reasonable worker from making or supporting a charge of discrimination." (quotation marks omitted)).

In *Harris*, 2019 WL 5423768, Chief Judge James K. Bredar stated that although "courts in this circuit have recognized threated termination as adverse action in the context of retaliation claims, the standard for adverse employment action in discrimination claims is significantly more rigorous."  *Id*. at *6 (citing *Boone*, 178 F.3d at 255 (adverse action in discrimination claim usually requires "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion")).   And, in *Taylor v. Burwell*, PWG-13-1998, 2014 WL 3547337, at *9 (D. Md. July 16, 2014), Judge Paul Grimm also cast doubt on

whether threats to terminate employment are sufficient to constitute an adverse action in the context of a discrimination claim.

The allegations here, even if proven, would not establish that the denial of the proposed work schedule for secondary employment created a material change in the terms of plaintiff's BPD employment.  Nor is there any indication that the threat of termination had any tangible effect on the terms or conditions of plaintiff's employment with the BPD.  Without such an effect, there is no adverse employment action.

Arguably, the assertions sound in constructive discharge—*i.e.*, an allegation that when the BPD approved the secondary employment request but then denied the related request to modify plaintiff's work schedule to accommodate the secondary employer, defendant made it "impossible" for plaintiff to continue working at the BPD if she also pursued secondary employment.  *See* ECF 20-1 at 10.

A claim of constructive discharge arises when an employee resigns because the "circumstances of discrimination" made the employee's working conditions "'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'"  *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004)).  To establish a claim of constructive discharge, a claimant "must prove first that [s]he was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign" and then show that she actually resigned.  *Green*, 578 U.S. at 555; *see also Perkins v. International Paper Company*, 936 F.3d 196, 211-12 (4th Cir. 2019); *Crockett v. SRA Int'l*, 943 F. Supp. 2d 565, 576 (D. Md. 2013); *Lopez v. BMA Corp.*, DKC-13-2406, 2013 WL 6844361 (D. Md. Dec. 24, 2013).

Regarding the "intolerability" of the work environment, the Fourth Circuit instructed in *Perkins*, 936 F. 3d at 212 (internal quotation marks and internal citations omitted; emphasis in original):

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign. Instead, intolerability is assessed by the objective standard of whether a reasonable person in the employee's position would have felt *compelled* to resign . . . that is, whether he would have had *no choice* but to resign.

"Proof of constructive discharge requires 'a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.'" *Perkins*, 936 F.3d at 211 (citation omitted).  And, the "frequency of the conditions at issue" is an important part of the intolerability assessment.  *Evans*, 936 F.3d at 193 (citing *Amirmokri v. Balt. Gas & Elec. Co*., 60 F.3d 1126, 1132 (4th Cir. 1995)).  "The more continuous the conduct, the more likely it will establish the required intolerability.  On the other hand, when the conduct is isolated or infrequent, it Is less likely to establish the requisite intolerability."  *Evans*, 936 F.3d at 193.

Intolerability is a high bar.  Without more, "difficult or unpleasant working conditions and denial of management positions . . . are not so intolerable as to compel a reasonable person to resign."  *Id*.; *see also James*, 368 F.3d at 378 ("[M]ere 'dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign.'") (citation omitted).  Further, constructive discharge requires a greater showing than a claim of hostile work environment.  *See Evans*, 936 F.3d 183, 193; *see also Nnadozie v. Genesis HealthCare Corp*., 730 Fed. App'x 151, 162 (4th Cir. 2018) ("The 'intolerability' standard governing constructive discharge claims is more stringent than the 'severe and pervasive' standard for hostile work environment claims.").

In my view, Gaines has not alleged facts that, if proven, would satisfy the standard for constructive discharge.  Plaintiff is clearly unhappy that it was not possible for her to work for the BPD as well as a television news reporter, and she believes the choice that she was asked to make was unfair.  But, "'not everything that makes an employee unhappy is actionable adverse action.'" *Thorn*, 766 F. Supp. 2d at 599 (quoting *Settle v. Baltimore Cnty*., 34 F. Supp. 2d 969, 989 (D. Md. 1999)), *aff'd*, 465 Fed. App'x 274 (4th Cir. 2012).  In other words, "an employee's dissatisfaction with this or that aspect of work does not mean an employer has committed an actionable adverse action." *James*, 368 F.3d at 379.

Assuming the truth of plaintiff's assertions, she was given a path by which she could have maintained her primary full-time employment with the BPD, without adverse consequences. Based on the allegations, this is simply not a situation in which defendant's treatment of plaintiff was "'so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green*, 578 U.S. at 555 (quoting *Pa. State Police*, 542 U.S. at 148).

Indeed, the circumstances, as alleged, fall short of other situations in which the Fourth Circuit has rejected a claim of constructive discharge.  *See, e.g.*, *Perkins*, 936 F.3d at 211-12 (employee asserted unfair assignments and employee rankings, being passed over for promotion, and hearing secondhand about racially offensive comments); *Williams v. Giant Food, Inc*., 370 F.3d 423, 434 (4th Cir. 2004) (employee was yelled at, told he was a poor manager, chastised in front of customers, and required to work despite an injured back); *Matvia v. Bald Head Island Mgmt., Inc*., 259 F.3d 261, 273 (4th Cir. 2001) (employee asserted ostracism by coworkers, denial of management position, and mandatory counseling); *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F. 3d 239, 244 (4th Cir. 1997) (employee was ignored by coworkers and top management); *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (employee was dissatisfied work assignments, and also

subjected to criticism and unpleasant working conditions).  And, plaintiff has cited no authority to the contrary—nor, indeed, to any legal authority in her discussion of adverse actions.

**6.**

In sum, the Amended Complaint lacks allegations as to Zimmerman's duties, supervisors, schedule, or specifics of his secondary employment as a lawyer.  Additionally, even if the comparator allegations are sufficient, plaintiff's rehiring and resignation claims fail as to the requirement for an adverse employment action.  For the reasons set forth above, plaintiff has failed to state claims of discrimination in Counts I and II of the Amended Complaint.  Therefore, I shall dismiss those claims, with prejudice.

**B. Count III (Retaliation)**

Count III of the Amended Complaint alleges retaliation under Title VII.  Specifically, plaintiff alleges that she was "subjected to retaliation" after reporting discrimination to the BPD regarding Commissioner Davis's disapproval of her secondary employment.  ECF 16, ¶ 90; *see id.* ¶¶ 87-111.  Again, defendant argues that plaintiff has failed to identify an adequate comparator and, in any event, did not suffer an adverse action.  ECF 19-1 at 18.

As indicated, Title VII contains protections against retaliation by an employer against an employee for engaging in certain kinds of protected activity.  And, the *McDonnell Douglas* proof scheme applies to a retaliation claim.  *Smith v. CSRA*, *Inc.*, 12 F.4th 396, 416 (4th Cir. 2021).  At trial, "[a] plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the [*McDonnell Douglas*] burden-shifting framework." *Strothers*, 895 F.3d at 327 (citing *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)).

Reference to the elements of a claim of retaliation is helpful.  To prove a retaliation claim, a plaintiff must establish "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.'"  *Okoli v. City of Baltimore*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted); *see Wormuth*, 54 F.4th at 212; *Sempowich*, 19 F.4th at 653; *Roberts*, 998 F.3d at 122; *Kitlinski*, 994 F.3d at 232; *Strothers*, 895 F.3d at 327; *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 217 (4th Cir. 2016); *Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 Fed. App'x 146, 151 (4th Cir. 2017); *Foster*, 787 F.3d at 250; *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 578 (4th Cir. 2015).

As noted, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation."  *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *see Netter*, 908 F.3d at 937.  "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace."  *Laughlin*, 149 F.3d at 259; *see* 42 U.S.C. § 2000e-3(a).

"Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'"  *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013) (citation omitted).  And, "[c]omplaints raised through internal company procedures are recognized as protected activity."  *Roberts*, 998 F.3d at 122.  As the Fourth Circuit has said, "[t]o fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures."  *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) (citation omitted); *see Laughlin*, 149 F.3d at

259 ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.")  But, "for an employee's activity to constitute protected 'opposition,' she must show (1) that she reasonably believed that the employment action she opposed constituted a Title VII violation, and (2) that her conduct in opposition was reasonable." *Netter*, 908 F.3d at 937-38.

The second element is that of an "adverse action."  In general, an adverse employment action is one that adversely affects the terms, conditions, or benefits of employment. *Roberts*, 998 F.3d at 122.  However, in *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case.  (Emphasis added.)  In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.*; *see also Burlington Northern*, 548 U.S. at 64 ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."); *Barnes v. Charles Cty. Pub. Schools*, 747 Fed. App'x 115, 119 (4th Cir. 2018) (per curiam) ("An adverse action need not affect the terms and conditions of employment" in a retaliation claim.)  Thus, "[t]he scope of Title VII's anti-retaliation provision . . . is broader than the anti-discrimination provision." *Strothers*, 895 F.3d at 327.

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67; *see also Ray*, 909 F.3d at 667.  So, "retaliatory actions do have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68).  As the Court explained in *Wormuth*, 54 F.4th at 213, the standard of "'materially adverse' . . . separates minor harms from those that threaten to

chill employees from opposing unlawful discrimination." And, a retaliation claim is assessed "against the perspective of a reasonable employee to void 'the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.'" *Id.* at 213-14 (quoting *Burlington Northern*, 548 U.S. at 68-69).

Therefore, there must be "some direct or indirect impact on an individual's employment . . . ." *Adams*, 789 F.3d at 431. In other words, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68). Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019). But, "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions. *Boone*, 178 F.3d at 255.

Judge Grimm has explained: "Even with this lower bar [for retaliation], none of the following constitutes an adverse employment action in a retaliation claim: failing to issue a performance appraisal; moving an employee to an inferior office or eliminating the employee's work station; considering the employee 'AWOL'; or issuing a personal improvement plan, 'an Attendance Warning,' a verbal reprimand, 'a formal letter of reprimand,' or 'a proposed termination.'" *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (internal citations omitted). This passage has been widely cited in this District. *See, e.g.*, *Draughn v. Wormuth*, RDB-20-3625, 2021 WL 5742236, at *8 (D. Md. Dec. 1, 2021); *Kelly v. Berryhill*, RDB-18-0049, 2019 WL 1300816, at *5 (D. Md. Mar. 20, 2019); *Lockley v. Town of Berwyn Heights*, JFM-14-825, 2015 WL 5334256, at *11 (D. Md. Sept. 11, 2015). However, the Fourth Circuit has said that "a letter of warning did amount to an adverse action because [plaintiff's

supervisor] warned [plaintiff] that future disciplinary actions could result in further discipline, including termination." *Barnes*, 747 Fed. App'x at 119.

To establish causation under Title VII, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see also Irani*, 767 Fed. App'x at 421. The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster*, 787 F.3d at 249. This requirement of but-for causation imposes a higher burden on a plaintiff than the mixed-motive requirement in Title VII's antidiscrimination provision. *See Foster*, 787 F.3d at 249-50.

Nevertheless, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335; *see CSRA, Inc.*, 12 F.4th at 417. Indeed, "'[v]ery little evidence of a causal connection is required to establish a prima facie case [of retaliation].'" *Burgess v. Bowen*, 466 Fed. App'x 272, 283 (4th Cir. 2012) (citation omitted; alterations in *Burgess*); *see CSRA, Inc.*, 12 F.4th at 417; *Roberts*, 998 F.3d at 127. As the Fourth Circuit explained in *Foster*, 787 F.3d at 250-52, "*Nassar* [did] not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim," because it did not require establishing but-for causation at the prima facie stage, and but-for causation is already required at the pretext stage.

"A plaintiff may attempt to demonstrate that a protected activity caused an adverse action 'through two routes.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson v. United Parcel Service, Inc.*, 839 Fed. App'x 781, 783-84 (4th Cir. 2021)); *see Wormuth*, 54 F.4th at 218-19; *CSRA, Inc.*, 12 F.4th at 417. "A plaintiff may establish the existence of facts that 'suggest[] that the adverse action occurred because of the protected activity.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson*, 839 Fed. App'x at 783-84); *see Wormuth*, 54 F.4th at 218. Or, a plaintiff may demonstrate that "the adverse

act bears sufficient temporal proximity to the protected activity[.]" *Wormuth*, 54 F.4th at 218; *CSRA, Inc.*, 12 F.4th at 417; *Johnson*, 839 Fed. App'x at 784 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). Notably, "[t]he existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action." *Roberts*, 998 F.3d at 123.

To be sure, "temporal proximity suffices to show a causal relationship." *Sempowich*, 19 F.4th at 654. In *Strothers*, 895 F.3d at 335-36, the Court said: "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *See also Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) ("In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity.") (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

For the temporal route, there naturally must exist "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501. But, "there is no 'bright-line rule' for when temporal proximity helps or hurts a cause of action for retaliation . . . ." *Wormuth*, 54 F.4th at 219 (quoting *Roberts*, 998 F.3d at 126-27). However, temporal proximity may establish causation only if it is "very close." *Clark Cty. Sch. Dist. v. Breedan*, 532 U.S. 268, 273 (2001). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted).

Notably, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n. 5 (4th Cir. 2003)). Moreover, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc*., 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

But, as indicated, temporal proximity is not the sole avenue to allege and later show causation. *CSRA, Inc.*, 12 F. 4th at 417. Rather, temporal proximity is one of two paths to show causation. As noted, the other path contemplates "the existence of facts that 'suggest[] that the adverse action occurred because of the protected activity.'" *Roberts*, 998 F.3d at 123 (citation omitted).

Count III of the Amended Complaint, alleging retaliation, is specific as to the basis for the retaliation claim. In relevant part, the Amended Complaint asserts, ECF 16, ¶ 90:

> Here, Plaintiff was retaliated against after reporting discrimination to Defendant regarding Commissioner Davis' disapproval. Soon after complaining of discrimination, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII. Specifically, the adverse employment action regarding Plaintiff's secondary employment was the denial of her work schedule in an effort to retaliate against her for her pushback against Commissioner Davis' disapproval. After Plaintiff's statutorily protected activity, she was subjected to retaliation, including but not limited to, where Plaintiff was forced to resign, even though similarly situated Caucasian male employees such as Officer Zimmerman were allowed to obtain secondary employment approval through their Shift Commander without threat of termination or accusations of insubordination.

41

In the Opposition, plaintiff argues that her protected activity occurred after Davis denied her secondary employment request, when she requested an explanation from Davis as to why similarly situated Caucasian male employees did not need approval from Davis for their secondary employment requests. *See* ECF 20-1 at 10-12; ECF 16, ¶ 35. And, as noted in my Memorandum Opinion of May 9, 2022 (ECF 14 at 49), plaintiff's request for an explanation from Davis likely constituted protected opposition activity. *See Laughlin*, 149 F.3d at 259 ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.").

However, at the time plaintiff sought an explanation, Commissioner Davis had already denied Gaines's request for secondary employment. ECF 16, ¶¶ 27-35. Therefore, the protected activity did not lead to adverse action. And, "[a]fter Plaintiff pushed back against the disapproval and made the [alleged] discriminatory behavior known through conversations with her supervisors, BPD approved the secondary employment request again." *Id.* ¶ 36. Consequently, plaintiff's situation actually *improved after* she engaged in protected activity.

To be sure, plaintiff then alleges that, at some later point, defendant "proceeded to reject Plaintiff's work schedule." *Id.* ¶ 37. But, as mentioned above, plaintiff did not have secondary employment approval before her protected activity. Thus, there was no *"*direct or indirect impact on [the] individual's employment . . . ."* *Adams*, 789 F.3d at 431. And, "retaliatory actions . . . have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68); *see Wormuth*, 54 F.4th at 213, 216.

Gaines alleges that she was then "forced to retire" from the BPD. ECF 16, ¶ 40. However, as discussed above, plaintiff was not "constructively discharged." Instead, she chose to resign

from BPD.  Accordingly, plaintiff's allegations, even if true, do not establish a retaliation claim.  I shall dismiss the claim, with prejudice

### C.  Count IV (Section 1981)

Pursuant to 42 U.S.C. § 1983, Count IV of the Amended Complaint alleges a claim under the Civil Rights Act of 1866, 42 U.S.C. § 1981.  In pertinent part, 42 U.S.C. § 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . .  to the full and equal benefit of all laws . . . as is enjoyed by white citizens[.]"  42 U.S.C. § 1981(a).  Among other things, § 1981 "prohibits discrimination in employment on the basis of race."  *Yashenko v. Harrah's N.C. Casino Co., LLC*, 446 F.3d 541, 551-52 (4th Cir. 2006); *see Johnson v. Ry. Express Agency, Inc*., 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination . . . on the basis of race."); *Nnadozie*, 730 Fed. App'x at 156.

Plaintiff alleges that "the unlawful conduct and adverse actions alleged throughout this Complaint" were because of plaintiff's race, sex, and engagement in protected activity.  ECF 16, ¶ 123.  She contends, *inter alia*, that defendant deprived her of her due process rights, in violation of § 1981, *id*. ¶ 116, and "failed to adopt clear policies and failed to properly train its management officials in handling, managing, and protecting employees who engage in statutorily-protected activities within the Police Department."  *Id*. ¶ 121.  Moreover, she asserts "a custom of discrimination and retaliation . . . ."  *Id*. ¶ 130.  Defendant counters that plaintiff has failed to state a "Monell Claim."  ECF 19-1 at 21.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).

Under 42 U.S.C. § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured

by the Constitution and laws" of the United States.  *See, e.g., Nieves v. Bartlett*, ___ U.S. ___, 139 S. Ct. 1715, 1721 (2019); *Filarsky v. Delia*, 566 U.S. 377, 383 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48, (1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997).

"The first step in any such claim is to pinpoint the specific right that has been infringed."  *Safar*, 859 F.3d at 245.  Here, the right arises under § 1981.  To state a claim for race discrimination under § 1981, a plaintiff must allege "'1) membership in a protected class; 2) satisfactory job performance; 3) adverse employment action; and 4) different treatment from similarly situated employees outside the protected class.'"  *Giles v. National Railroad Passenger Corporation* (Amtrak), ___ F.4th ___, 2023 WL 1872313, at *4 (4th Cir. February 10, 2023).

As noted, under § 1983, the alleged violation must be committed by a person acting under

color of State law.  The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982)).  A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (Citations and internal quotation marks omitted).

There is no respondeat superior liability under § 1983.  *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).  Thus, § 1983 requires a showing of personal fault based upon a defendant's own conduct.  *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights).

In *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), the Supreme Court stated: "We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides for the exclusive

federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Id*. at 735.[11]  The Fourth Circuit has instructed that "the § 1983 requirement that plaintiffs show an official policy or custom of discrimination also controls in § 1981 actions against state entities." *Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156 (4th Cir. 1995); *see also Lewis v. Robeson Cty.*, 63 Fed. App'x 134, 138 (4th Cir. 2003) (same); *Farmer v. Ramsay*, 43 Fed. App'x 547, 553 n.8 (4th Cir. 2002) (observing that a plaintiff suing a state or municipal actor "has no cause of action based on § 1981 independent of § 1983"); *Windsor v. Bd. of Educ. of Prince George's Cty*., TDC-14-2287, 2016 WL 4939294, at *12 (D. Md. Sept. 13, 2016); *Victors v. Kronmiller*, 553 F. Supp. 2d 533, 541-44 (D. Md. 2008).

Notably, § 1983 suits by individuals against a state for money damages are barred by the state sovereign immunity embodied in the Eleventh Amendment. *See Quern v. Jordan*, 440 U.S. 332, 345 (1979).  But, the weight of authority in this District holds that the BPD is a municipal entity for purposes of § 1983. *See, e.g.*, *Earl v. Taylor*, CCB-20-1355, 2021 WL 4458930, at *3 (D. Md. Sept. 29, 2021); *Lucero v. Early*, GLR-13-1036, 2019 WL 4673448, at *4 (D. Md. Sept. 25, 2019); *Bumgardner v. Taylor*, RBD-18-1438, 2019 WL 1411059, at *5 (D. Md. Mar. 28, 2019); *Fish v. Mayor and City of Balt*., CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018); *Chin v. City of Balt*., 241 F. Supp. 2d 546, 548 (D. Md. 2003); *Alderman v. Balt. Police Dep't*, 952 F. Supp. 256, 258 (D. Md. 1997).[12]

---

[11] "State actor" in this context refers more broadly to state action, whether by "state or municipal entities." *Stout v. Reuschling*, TDC-14-1555, 2015 WL 1461366, at *6 (D. Md. Mar. 27, 2015).

[12] On November 8, 2022, "82% of Baltimore [City] voters approved a ballot measure to bring the police department back under local control." *Baltimore Police Being Placed Under City Control After Functioning as State Agency*, POLICE MAG. (Nov. 14, 2022), https://www.policemag.com/649878/baltimore-police-being-placed-under-city-control-after-functioning-as-state-agen.

Sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta by and through Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)).  Indeed, as judges of this Court have consistently explained in the cases cited above, the BPD does not enjoy state sovereign immunity for purposes of a § 1983 claim. This is because it is "sufficiently concerned with local matters, independently funded, interconnected with local government, and autonomous from state government . . . ." *Earl*, 2021 WL 4458930, at *3.   To the contrary, BPD is a "person" subject to suit under § 1983.  *See*, *e.g.*, *Fish*, 2018 WL 348111, at *3.

The Supreme Court determined in *Monell*, 436 U.S. 658, that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an "official municipal policy" that resulted in a violation of the plaintiff's rights.  *Id*. at 691.  "Official municipal policy includes decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and

In a report published in 2019 by the Abell Foundation, George A. Nilson, Esquire, a former City Solicitor, stated, *The Abell Report*, ABELL FOUND. (March 2019), at 6:

> The most significant impact of a change from State Agency status to City Agency status relates to the legal immunities that currently offer some protection to the Police Department and Baltimore City when citizens claim to have been mistreated by police officers.  Currently, the Police Department is protected by State sovereign immunity that provides a greater level of protection than local immunity.  If the Police Department becomes a City Agency, it would lose the protection of State sovereign immunity and be exposed to significantly higher damages awards in civil lawsuits.

widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see Pembaur v. Cincinnati*, 475 U.S. 469, 479-80 (1986).

Thus, a viable *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g., Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 446, 451 (4th Cir. 2004); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003); *see also Washington v. Housing Authority of the City of Columbia*, 58 F. 4th 170, 177 (4th Cir. 2023).

As the *Monell* Court said, 436 U.S. at 694, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 F. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

In *Connick* 563 U.S. at 60, the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665-683, 98 S. Ct. 2018). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691, 98 S. Ct. 2018; *Canton*, 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 [] (1997) (collecting cases).

Notably, "'municipal liability cannot be premised on *respondeat superior* or vicarious liability.'" *Washington*, 58 F.4th at 182 (quoting *Buffington v. Baltimore County*, 913 F.2d 113,

133 (4th Cir. 1990)); *see also Monell*, 436 U.S. at 693-94.  Moreover, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'"  *Lozman v. City of Riviera Beach*, ___U.S.___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984).  In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation."  *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see also Washington*, 58 F.4th at 182.

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens."  *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).  "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality."  *Bd. of Comm'rs of Bryan Cty*., 520 U.S. at 403-04.

 "An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'"  *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted).  In addition, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances."  *Id.*

Beyond "formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage"

with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003).  A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 F. App'x at 799.  In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan*, 743 F.2d at 229 (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that to establish a *Monell* claim based on custom, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*).  Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).  "This requires a plaintiff to 'demonstrate a direct causal link between the municipal action and the deprivation of federal rights.'" *Washington*, 58 F.4th at 182 (quoting *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 404).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal

employees." *Milligan*, 743 F.2d at 230.   Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983.   *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).   "To prove deliberate indifference, a plaintiff must show 'that the [defendant] subjectively recognized a substantial risk of harm and that his actions were inappropriate in light of the risk.'"   *Washington*, 58 F.4th at 179 (quoting *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 416 (4th Cir. 2020)).

In this case, plaintiff has not come close to asserting an official policy or custom by the BPD that might give rise to liability.   To be sure, the Amended Complaint contains a cursory reference to the BPD's "widespread constitutional violations, the targeting of African Americans, and a culture of retaliation," and plaintiff attempts to place her case in that context. ECF 16, ¶ 1.[13] In her Opposition, Gaines argues that "the actions that BPD took against Plaintiff exemplified the practice of retaliation throughout BPD in an effort to quiet those who speak out against discrimination and retaliation that has become so persistent and widespread, that the pattern of retaliation against whistleblowers ais [sic] considered a custom."   ECF 20-1 at 12.   However, aside from these vague references to the overall institutional problems of the BPD, plaintiff makes no allegations as to how the discrimination she asserts is connected to these broader issues.

Moreover, in the Amended Complaint, plaintiff added no additional facts or allegations to establish a "widespread and persistent" pattern, practice, or custom that would have provided

---

[13] The Court may take judicial notice of the fact that, in recent decades, almost every BPD Commissioner and Mayor of Baltimore has been African American.   *See* Rule 201 of the Federal Rules of Evidence.   In particular, since 1987, Baltimore City has had only one White Mayor (Martin O'Malley, 1999-2007).   Bishop Robinson, who served as BPD Commissioner from 1984 to 1987, was the first African American to hold the position.   Since then, several of the BPD Commissioners have been Black, including the current Commissioner, Michael Harrison. However, as noted, Former Commissioner Davis is White.

actual or constructive notice of such conduct to BPD such that the failure to address it would constitute "deliberate indifference." *See Johnson v. Baltimore Police Dep't*, 452 F. Supp. 3d 283, 310 (D. Md. 2020) ("[A[ plaintiff must state facts showing 'a persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference.'") (citing *Owens*, 767 F.3d at 402-03).

Deliberate indifference "is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cty.*, 520 U.S. at 410.  It is "more than negligence but less than intentional harm . . . ." *Washington*, 58 F.4th at 178.  "To prove deliberate indifference, a plaintiff must show 'that the [defendant] subjectively recognized a substantial risk of harm and that his actions were inappropriate in light of the risk.'" *Id.* at 179 (quoting *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 416 (4th Cir. 2020).

In addition, the Amended Complaint references BPD policies and practices as to the approval process for secondary employment requests.  ECF 16, ¶¶ 25, 27, 29.  But, these policies and practices are not alleged to be unconstitutional.  Instead, the alleged discrimination against plaintiff took the form of the specific way in which the BPD approached her particular secondary employment request.  Furthermore, there are no allegations to show that any BPD policy, written or otherwise, was consciously chosen with a deliberate disregard for plaintiff's constitutional rights.  *See City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985) ("'policy' generally implies a course of action consciously chosen from among various alternatives").

As indicated, plaintiff also asserts a failure to train claim, which is a species of a *Monell* claim.  The manner in which a municipality trains its employees is "necessarily a matter of 'policy.'"  *Spell*, 824 F.2d at 1389.  In *Canton*, 489 U.S. at 389, the Supreme Court said that "where

a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983."

A plaintiff who seeks to establish *Monell* liability based on inadequate training must demonstrate "(1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the [official's] conduct resulted from said training*." Lewis v. Simms*, AW-11-2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v. Stevenson*, WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014) (per curiam).

"Training policy deficiencies can include (1) 'express authorizations of unconstitutional conduct,' (2) 'tacit authorizations' of such unconstitutional conduct, and (3) failures to adequately 'prohibit or discourage readily foreseeable conduct in light of known exigencies'" of the relevant profession. *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 533 (D. Md. 2020) (quoting *Spell*, 824 F.2d at 1390). But, "the training deficiency 'must be closely related to the ultimate injury,' meaning it must cause the incident." *Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 951 F.3d 661, 672 (4th Cir. 2020) (quoting *Canton,* 489 U.S. at 391).

"Inaction, too, can give rise to liability in some instances if it reflects 'a conscious decision not to take action.'" *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citation omitted). A municipal entity's "'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision . . . to violate the Constitution.'" *Connick,* 563 U.S. at 61-62 (quoting *Canton,* 489 U.S. at 395) (O'Connor, J., concurring in part and dissenting in part)).

A municipality may be deemed deliberately indifferent in regard to training "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights . . . if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61. The policymakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action – the 'deliberate indifference' – necessary to trigger municipal liability." *Bryan Cty.*, 520 U.S. at 407. But, in the absence of notice "that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

Of import here, even if "a particular [employee] may be unsatisfactorily trained," that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91. Indeed, "proving an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice." *Connick*, 563 U.S. at 68 (cleaned up). Rather, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (quoting *Bryan Cty.*, 520 U.S. at 409). The *Canton* Court reasoned, 489 U.S. at 391:

> Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained [employees] occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

To be sure, under *Monell*, "'municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.'" *Love-Lane*, 355 F.3d at 782 (quoting *Pembaur*, 475 U.S. at 480). But, "[t]o hold a municipality liable for a single decision (or violation), the decisionmaker must possess 'final authority to establish municipal policy with respect to the action ordered.'" *Love-Lane*, 355 F.3d at 782 (quoting *Pembaur*, 475 U.S. at 481). Thus, liability under § 1983 accrues to a municipality only if the governing body of the municipality "retain[s] final review authority" over the "personnel decision." *Love-Lane*, 355 F.3d at 782.

Davis, as the Police Commissioner, could be considered the decisionmaker with "'final authority to establish . . . policy with respect to the action ordered.'" *Love-Lane*, 355 F.3d at 782 (quoting *Pembaur*, 475 U.S. at 481). However, the Amended Complaint makes no explicit allegations as to this issue. Yet, this seems to be implicit in Davis's alleged assertion that his personal approval was required for all secondary employment requests. *See* ECF 16, ¶¶ 27, 29. Furthermore, "a single act by a municipality may give rise to civil liability if it is shown that the officials of the municipality responsible for establishing the challenged policy made a calculated choice to follow the course of action deemed unconstitutional." *Pachaly v. City of Lynchburg*, 897 F.2d 723, 726 (4th Cir. 1990).

But, even assuming that conduct by Davis falls within the ambit of *Monell*, plaintiff has not stated a failure to train claim. Gaines has not provided any facts that would support the inference that an alleged failure to train as to "handling, managing, and protecting employees who engage in statutorily-protected activities" was a deliberate or conscious choice by the BPD. ECF 16, ¶ 121. Indeed, the Amended Complaint alleges that it was Davis himself who mistreated plaintiff by failing to rehire her at the rank of Sergeant and allegedly made her choose between jobs. *See, e.g.*, *id*. ¶¶ 21, 33-40. This was not the conduct of other personnel, according to plaintiff.

Perhaps more significant, plaintiff fails to recount a single allegation of BPD's discrimination against others; the claim is about conduct towards plaintiff. The few sporadic incidents alleged in the Amended Complaint are not consistent with a policy, custom, or practice sufficient for *Monell* liability to attach. *See Owens*, 767 F.3d at 403 ("Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will.") (quoting *Spell* at 1387); *see also Corbitt v. BPD,* RDB-20-3431, 2021 WL 3510579, at *7 (D. Md. Aug. 10, 2021) ("[A] single incident alone will not establish a policy or custom and requisite causal connection to [Section] 1983 deprivation of rights.").

And, the framework of proof for claims of intentional employment discrimination brought under § 1981 is the same as the framework applicable to a Title VII claim. *See Love-Lane*, 355 F.3d at 786 (stating, in a case involving an employment discrimination claim under Title VII, § 1981, and § 1983, that "the elements required to establish such a case are the same under all three statutes")); *see also Giles*, 2023 WL 1872313, at *4 ("When addressing race-discrimination claims under § 1981, courts apply the burden-shifting framework established in *McDonnel Douglas*."). As noted, plaintiff has failed to state a claim for discrimination under Title VII. Therefore, she has also failed to state any claim under § 1981 in this context.

Accordingly, I will dismiss Count IV with prejudice and without leave to amend.

### D. Count V (FEPA)

Count V of the Complaint is brought under FEPA. Plaintiff alleges that, in violation of FEPA, she was "subjected to harassment or offensive conduct that is based on race and sex, where Plaintiff was denied reinstatement to her rank of Sergeant upon her rehire contrary to practice with white and/or male employees and when she was forced to resign, while similarly situated Caucasian male employees such as Officer Zimmerman were allowed to obtain secondary

employment approval through their Shift Commander, without the need for Commissioner approval." ECF 16, ¶ 138.

FEPA is the Maryland analogue to the federal employment discrimination statutes. *See Lowman v. Maryland Aviation Admin.*, JKB-18-1146, 2019 WL 133267, at *4 (D. Md. Jan. 8, 2019) (recognizing that FEPA "'is the state analogue of Title VII'") (citation omitted). Neither party has identified any relevant difference between FEPA and Title VII. Moreover, Maryland courts "'traditionally seek guidance from federal cases in interpreting [it].'" *Eubanks v. Mercy Medical Center, Inc.*, WDQ-15-513, 2015 WL 9255326, at *7 (D. Md. Dec. 17, 2015) (brackets added) (quoting *Haas v. Lockheed Martin Corp.*, 396 Md. 469, 481 (914 A.2d 735, 742 (Md. 2007)) (construing former Article 49B of the Maryland Code).

Defendant argues that Count V is barred by the applicable statute of limitations. ECF 19-1 at 25. The statute of limitations for bringing suit under FEPA is two years from the "occurrence of the most recent alleged unlawful employment practice." *Dale v. Md. Dep't of Transp.*, ELH-13-191, 2015 WL 221628, at *21 (D. Md. Jan. 15, 2015), *aff'd*, 672 F. App'x 323 (4th Cir. 2017) (per curiam); *see also Foster v. GeneDx, Inc.*, 417 F. Supp. 3d 673, 687–88 (D. Md. 2019) ("a two-year statute of limitations is applicable to claims brought pursuant to Maryland's FEPA.") (citing Md. Code, State Gov't Article ("S.G.") § 20-607(b)). Defendant points out that the most recent administratively exhausted incident noted in the Amended Complaint occurred on October 28, 2017, when plaintiff resigned from the BPD. ECF 16, ¶ 42. Because Gaines filed suit almost four years later, on May 17, 2021 (ECF 1), defendant claims that Count V must be dismissed as untimely. Plaintiff does not respond to this argument in her Opposition. ECF 20-1.

BPD also asserts sovereign immunity as to plaintiff's FEPA claim, arguing that Maryland has not waived its Eleventh Amendment immunity as to FEPA claims. ECF 19-1 at 26-27. And,

defendant argues that "[t]he BPD 'exists as an agency of the State, and therefore enjoys the common law sovereign immunity from tort liability of a State agency.'" *Id*. at 26 (quoting *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282 (2001); *see also Clea v. Balt*., 312 Md. 662 (1988) (holding that "unlike other municipal or county police departments which are agencies of the municipality or county, the Baltimore City Police Department is a State agency").

The BPD is included in the list of local governments that falls within the ambit of Maryland's Local Government Tort Claims Act ("LGTCA"), Md. Code (2020 Repl. Vol.), §§ 5-301 *et seq*, of the Courts of the Courts and Judicial Proceedings Article ("C.J."); *see* C.J. § 5-301(d)(21).   In particular, C.J. § 5–303(b)(2) prohibits a local government from "assert[ing] governmental or sovereign immunity to avoid the duty to defend or indemnify an employee" established in § 5–303(b)(1) of the LGTCA.

Courts have not interpreted the statute as a wholesale waiver of immunity.  *See Cherkes*, 140 Md. App at 305-06; *Williams v. Mayor of Balt.*, 128 Md. App. 1, 35 (1999) ("The LGTCA did not waive any governmental immunity enjoyed by [a local government] against citizens at large. It waived only that immunity which the [local government] might have asserted in an effort to avoid its responsibility to defend and to indemnify its employees.") (citing C.J. § 5– 303(b)(2)), *rev'd on other grounds*, 359 Md. 101 (2000)).  Nevertheless, as noted in the Court's prior Memorandum Opinion of May 9, 2022 (ECF 14), the issue of immunity need not be reached.

Of relevance here, Title VII case law applies to the adjudication of FEPA claims.  *See Haas v. Lockheed Martin Corp*., 396 Md. 469 (2007); *Linton v. Johns Hopkins Applied Physics Lab, LLC*, JKB-10-276, 2011 WL 4549177 at *5, n.3 (D. Md. Sept. 28, 2011).  And, plaintiff has failed to establish a valid claim for discrimination under Title VII.  Accordingly, she also fails to establish

a valid discrimination claim under FEPA.  Because plaintiff's FEPA claim should plainly be dismissed for the same reasons as her Title VII claims, I shall grant the Motion as to Count V.

### IV.  Conclusion

For the reasons stated above, I shall grant the Motion and dismiss the Amended Complaint, with prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date:   February 22, 2023                     _____/s/_____
                                              Ellen L. Hollander
                                              United States District Judge